852 F.2d 661
 Salvador BANDES, Plaintiff-Appellant, Cross-Appellee,
v.
HARLOW & JONES, INC., Defendants.
HARLOW & JONES, INC., Interpleader-Plaintiff,
v.
Salvador BANDES & David Alvarez, Interpleader-Defendants.
Salvador Bandes, Interpleader-Appellant, Cross-Appellee,
David Alvarez, Interpleader-Defendant-Appellee, Cross-Appellant.
 Nos. 1146 and 1281, Dockets 87-7631, 88-7203.
 United States Court of Appeals,
Second Circuit.
 Argued June 2, 1988.
Decided July 19, 1988.
 
 J. Joseph Bainton, New York City (Belinda L. Williams, Reboul, MacMurray, Hewitt, Maynard & Kristol, New York City, of counsel), for plaintiff-appellant Bandes.
 Michael Krinsky, New York City (David Golove, Rabinowitz, Boudin, Standard, Krinsky & Lieberman, New York City, of counsel), for interpleader-defendant-appellee Alvarez.
 Before KAUFMAN, MINER, Circuit Judges, and CONNER, District Judge.*
 IRVING R. KAUFMAN, Circuit Judge:
 
 
 1
 Within our nation's borders, we have adhered to the principle that government may not deprive its citizens of property without due process of law and just compensation. Of course, this ideal, embodied in the fifth and fourteenth amendments to the Constitution, constrains our federal and state governments, not those of other countries. But when a foreign sovereign, following hostilities, confiscates a defeated group's property and attempts to extend that taking to interests held here, a United States court will effectuate the seizure for only the weightiest reasons.
 
 
 2
 The dispute before us involves the expropriation of property following the Sandinista victory in Nicaragua's civil war. In late June of 1979, toward the end of that violent conflict, the Bandes family, along with numerous other associates of the tottering Somoza regime, fled the country in fear for their lives. The Bandeses left behind many of their possessions, including the steel company they largely owned and controlled, Industria Nacional de Clavos y Alambres de Puas, Sociedad Anonima ("INCA"). On July 17, 1979, General Anastasio Somoza was forced to resign as President, and, nine days later, the Sandinista forces "intervened"[1] the Bandeses company. Since then, INCA has been operated by David Alvarez, a representative of the Sandinista Government.
 
 
 3
 The Bandes family brought suit for title to an interpleaded sum of $420,000, representing the value of an undelivered shipment of steel billets, less offsets, produced by the Stamford, Connecticut, company Harlow and Jones, Inc. ("H & J"). The billets were ordered by INCA in 1978, before intervention. Alvarez, on behalf of the Sandinista Government, also lays claim to the interpleaded fund. Because the Sandinista Government has not presented a compelling reason for this Court to forego constitutional protections, we decline to award it any part of the fund. In addition, we find that the amount distributed to the Bandes family, representing the pro rata interest they held in INCA, was equitable, and we will not disturb that portion of the district court's judgment. The award of attorney's fees to Alvarez, however, is reversed: this representative of the Sandinista Government did not assist in creating a common fund to benefit unrepresented shareholders and hence should not be granted counsel's compensation.
 
 BACKGROUND
 
 4
 Since 1960, INCA has manufactured and sold steel products, including nails, barbed wire, and steel construction wires, for domestic consumption and export. Salvador Bandes, patriarch of the Bandes family and founder of INCA, acted as its General Manager and President of its Board of Directors. His wife, Georgette Bandes ("G. Bandes"), was Vice President, and other members of the family held various positions of responsibility for INCA's operation. At full production in 1979, INCA employed nearly 350 workers and supplied in excess of 50% of the domestic Nicaraguan need for its products. In fact, in the first half of that year, INCA met 100% of Nicaragua's demand for construction steel rods, 60% of the want for nails, and 80% of the need for barbed wire.
 
 
 5
 Although much of the dispute concerns the "intervention" of INCA by the Sandinistas, this was not INCA's first involvement with Nicaragua's government. In 1976, apparently as a condition to doing business in Nicaragua, INCA issued slightly more than 18% of its stock to General Ulises Carillo and General Jose Somoza, the brother of dictator General Anastasio Somoza (collectively, the "Somoza shares"). When the Bandeses fled their homeland, they controlled 72.9% of the shares, the Somoza Generals owned 18.2%, and the remainder was held by more than fifty Nicaraguan businessmen.
 
 
 6
 The Bandes family operated INCA throughout most of the civil war. The order in question, a shipment of 2000 tons of steel billets produced by H & J, was placed in 1978, in the midst of the conflict. According to the terms of the contract, delivery was INCA's responsibility. INCA paid the purchase price of $460,000 in early 1979, but it never arranged for the goods to be transported.
 
 
 7
 After the coup, the Sandinistas wasted no time in attempting to repair Nicaragua's damaged economy. On July 20, 1979--three days after General A. Somoza resigned--the new Government Council issued Decree No. 3, empowering the Attorney General of Justice of Nicaragua "to proceed immediately with the intervention, requisition and confiscation of all assets of the Somoza family, military personnel, and civil servants who have abandoned the country since December 1977."[2] Thus, the Somoza shares were expropriated by the Sandinistas. Two days later, Decree No. 10 was enacted, declaring that managers of businesses who abandoned or hindered the economy's operation had committed a crime. The Bandes family was thereby subjected to criminal penalties.[3] In addition, Decree No. 10 authorized the state to "intervene" and take control of abandoned businesses. Within the week, the holdings of the Bandes family in INCA were confiscated, and David Alvarez, the interventor, was placed at the helm of the corporation.[4]
 
 
 8
 On August 1, 1979, Alvarez held a general shareholders meeting and, after appointing representatives for the Bandes family, successfully removed the Bandeses from their positions as officers of INCA and stripped them of their attendant powers.
 
 
 9
 By this time, the Bandes family had resettled in Honduras. Although Alvarez met with Salvador Bandes there in August of 1979, he could not convince the former manager of INCA to return to Nicaragua without ensuring immunity from criminal prosecution--an action he was unauthorized to take. Subsequently, acting pursuant to a long-held general power of attorney on behalf of INCA, Salvador Bandes contacted H & J in Connecticut and commenced negotiations for the return of the $460,000. The two parties agreed that H & J should refund to Bandes $420,000, representing the purchase price reduced by the cost of recission and nearly $20,200 in payment of an obligation owed by INCA to H & J. INCA was also to be relieved of its contractual duty to take delivery of the shipment. On September 6, however, before payment, H & J received a telex from interventor Alvarez stating that INCA was operating under government administration and as a Fideicomissary--an appointed official equivalent to a fiduciary--he alone was authorized to represent the company in all business transactions.
 
 
 10
 Bandes brought suit against H & J on September 25, 1979, in the Southern District of New York. A few days later, seeking to avoid double liability, H & J filed an interpleader complaint against Bandes and Alvarez. Both claimants moved for summary judgment.
 
 
 11
 Finding no genuine issue regarding any material fact, Judge Owen ruled in favor of Bandes, holding that the act of state doctrine did not bar judicial resolution of the dispute. Bandes v. Harlow & Jones, Inc., 570 F.Supp. 955, 959-61 (S.D.N.Y.1983). Salvador Bandes subsequently died, and the court entered an order appointing his wife, Georgette Bandes, the Vice President of pre-intervention INCA, as representative of the Bandes family's interests. See Bandes v. Harlow & Jones, Inc., Court Memorandum and Order, 79 Civ. 5091 (S.D.N.Y. July 3, 1985). After the issues were fully briefed, Judge Owen distributed the fund--which, including interest, had grown to nearly $900,000--by creating the fiction of a corporate dissolution. He set aside $171,759 with interest for the benefit of the preferred shareholders. Nearly 73% of the balance was allotted to G. Bandes, and the remainder was reserved for the minority shareholders of INCA, including 18.2% reflecting the Somozan Generals' pro rata portion of INCA. The court also provided for notice to be sent to the unrepresented shareholders and determined that any unclaimed amount would escheat to New York pursuant to the state's Abandoned Property law. N.Y. Aband.Prop.Law Secs. 1200-1223 (McKinney 1944 & Supp.1988). Finally, for his efforts in creating the fund for the minority and preferred shareholders, the court awarded Alvarez his attorney's fees and expenses, amounting to $51,811.67, to be paid from the minority shareholder's fund.
 
 
 12
 Both parties appeal.
 
 DISCUSSION
 I. The Act of State Doctrine
 
 13
 At the outset, we must address the district court's conclusion that the act of state doctrine does not bar judicial resolution of the dispute. The touchstone of the doctrine is the principle of comity between nations--courts in one country should avoid inquiries respecting the validity of the acts executed by a foreign sovereign within its territory. The Supreme Court stated more than ninety years ago in Underhill v. Hernandez, 168 U.S. 250, 252, 18 S.Ct. 83, 84, 42 L.Ed. 456 (1897):
 
 
 14
 Every sovereign State is bound to respect the independence of every other sovereign State, and the courts of one country will not sit in judgment on the acts of the government of another done within its own territory. Redress of grievances by reason of such acts must be obtained through the means open to be availed of by sovereign powers as between themselves.
 
 
 15
 The doctrine has constitutional underpinnings as well. It clearly reflects fundamental notions of separation of powers in urging that our nation conduct its foreign relations with the unified voice of the Executive branch rather than through a multitude of judicial pronouncements. Banco Nacional de Cuba v. Sabbatino, 376 U.S. 398, 84 S.Ct. 923, 11 L.Ed.2d 804 (1964). Indeed, if the Judiciary were to engage in the task of passing on the validity of foreign acts of state, it may well hinder this country's pursuit of goals both for itself and for the community of nations as a whole.
 
 
 16
 The doctrine also recognizes the practical limits of enforcing judicial mandates overseas. When another country's act has come to complete fruition within its dominion, it would be a waste of judicial resources for courts of the United States to condemn the result; there is little our courts can do to right a wrong committed in a foreign land. More important, the Supreme Court has emphasized that such a decision "would very certainly 'imperil the amicable relations between governments and vex the peace of nations.' " Oetjen v. Central Leather Co., 246 U.S. 297, 304, 38 S.Ct. 309, 311, 62 L.Ed. 726 (1918). See also Tabacalera Severiano Jorge, S.A. v. Standard Cigar Co., 392 F.2d 706, 715 (5th Cir.), cert. denied, 393 U.S. 924, 89 S.Ct. 255, 21 L.Ed.2d 260 (1968) ("[W]hen a foreign government performs an act of state which is an accomplished fact ... it would be an affront to such foreign government for courts of the United States to hold that such act was a nullity.").
 
 
 17
 The rationale, however, does not extend to property located within the United States. When another state attempts to seize property held here, our jurisdiction is paramount. Conversely, the foreign sovereign is acting beyond its enforcement capacity when it involves itself within our nation's jurisdiction. The act of state doctrine, accordingly, does not apply, and we may look to our own laws to determine the reach of the foreign sovereign's proscriptions. Republic of Iraq v. First National City Bank, 353 F.2d 47, 51 (2d Cir.1965), cert. denied, 382 U.S. 1027, 86 S.Ct. 648, 15 L.Ed.2d 540 (1966); Menendez v. Saks and Company, 485 F.2d 1355, 1364 (2d Cir.1973), cert. denied in part, 425 U.S. 991, 96 S.Ct. 2201, 48 L.Ed.2d 815, reversed in part on other grounds sub nom. Alfred Dunhill of London, Inc. v. Republic of Cuba, 425 U.S. 682, 96 S.Ct. 1854, 48 L.Ed.2d 301 (1976); United Bank Limited v. Cosmic International, Inc., 542 F.2d 868, 872-73 (2d Cir.1976). Only acts that are consistent with this nation's policies will be given effect within our borders. Restatement (Second) of Foreign Relations Law Sec. 43 (1965). See Restatement (Third) of Foreign Relations Law Sec. 443 comment b (1987).
 
 
 18
 H & J's Connecticut domicile places the situs of the H & J fund in the United States. See Republic of Iraq, 353 F.2d at 51 (where property in issue was an account with a bank located in the United States and only a United States court could compel distribution, the account was situated in the United States); Menendez, 485 F.2d at 1364 ("For purposes of the act of state doctrine, a debt is not 'located' within a foreign state unless that state has the power to enforce or collect it."); United Bank Limited, 542 F.2d 868 (debts owed by United States corporation for product supplied by two Pakistani corporations had situs in United States for act of state purposes). Upon examining the "intervention" of INCA, we also have no doubt that it was a "taking" contrary to United States policy. The guarantees of due process in the fifth and fourteenth amendments to our Constitution prohibit confiscations without just compensation. Republic of Iraq, 353 F.2d at 51-52. Nothing in the record indicates that Nicaragua has compensated the Bandes family for their losses. On the contrary, the rapid succession of events following the family's flight from that country implies that compensation was never considered when the Sandinistas seized control of INCA. Although some of the decrees enacted after the seizure of INCA seem to be belated attempts to mitigate the harshness of the Sandinista "intervention," we agree with the district court's finding that those decrees make no meaningful difference. Bandes, 570 F.Supp. at 962-63. The Bandes family no longer controls or owns the company they established, and in their shoes stands the Government Council through the agency of Alvarez. Without just compensation, such a taking is " 'shocking to our sense of justice,' " Republic of Iraq, 353 F.2d at 51, quoting Vladikavkazsky Ry. Co. v. New York Trust Co., 263 N.Y. 369, 378, 189 N.E. 456, 460 (1934), and we need not enforce it here.
 
 II. The Distribution of the H & J Fund
 
 19
 The challenges to the district court's distribution are equally meritless. G. Bandes seeks to receive the entire fund. Focusing on the amount reserved for Generals Juan Somoza and Ulises Carillo, she contends she deserves at least their portion in addition to the share already allotted to her. Specifically, she claims Generals Somoza and Carillo confiscated stock from the Bandes family without compensation in 1976, and hence our courts should not recognize that seizure by reserving money for the alleged wrongdoers.
 
 
 20
 We find this claim disingenuous. G. Bandes concedes that INCA was not wholly without benefit from the exchange of the Somoza shares. Import duties for raw material and taxes that otherwise would have been owed by INCA were waived as a result of the influence wielded by the Somoza associates.
 
 
 21
 But, G. Bandes answers, these advantages to INCA fall short of true compensation because the Somoza regime helped create poor market conditions specifically to extort an interest in the company. After the 1972 earthquake, she explains, the country was devastated and the Somoza Government promised large-scale reconstruction. Sensing new business prospects, INCA purchased an abundance of raw material, only to learn that the Government was permitting "certain individuals" to import European building materials, which were identical to INCA's products, free of duty. In addition, the promised construction was never completed. As a result, INCA was burdened with an enormous oversupply. The Generals, G. Bandes alleges, used this opportunity to have the National Bank, one of INCA's largest creditors, apply pressure on INCA to offer them a piece of the company. The Bandes family eventually offered the Generals 25,000 shares in INCA.
 
 
 22
 These facts do not alter our judgment. It is difficult to believe that the leader of a country would go to such great lengths to wrest less than 19% of INCA's stock from the control of the Bandes family. Furthermore, an inquiry of this sort carries its own act of state implications, requiring a determination of the reasons for and legitimacy of a foreign government's grant of customs and tax exemptions. See Hunt v. Mobil Oil Corp., 550 F.2d 68, 75-78 (2d Cir.), cert. denied, 434 U.S. 984, 98 S.Ct. 608, 54 L.Ed.2d 477 (1977); Occidental Petroleum Corp. v. Buttes Gas and Oil Co., 331 F.Supp. 92, 108-12 (C.D.Cal.1971), aff'd, 461 F.2d 1261 (9th Cir.1972) (per curiam ), cert. denied, 409 U.S. 950, 93 S.Ct. 272, 34 L.Ed.2d 221 (1972).
 
 
 23
 Even if we were to consider the claim, there are due process problems in depriving the Generals--who are not parties in this action--of property without affording them notice and the opportunity to defend their interests in court. See Logan v. Zimmerman Brush Co., 455 U.S. 422, 433-34, 102 S.Ct. 1148, 1156, 71 L.Ed.2d 265 (1982); Burtnieks v. City of New York, 716 F.2d 982, 987 (2d Cir.1983). See also Zenith Radio Corp. v. Hazeltine Research, Inc., 395 U.S. 100, 109-12, 89 S.Ct. 1562, 1569-70, 23 L.Ed.2d 129 (1969) (holding that one is not bound by a judgment resulting from litigation in which he is not designated a party or to which he has not been made a party by service of process).
 
 
 24
 Moreover, we are hesitant to award the Bandes family the portion of the fund reserved for the Generals because, as former managers of INCA, they lack clean hands. In accepting exemptions that were not offered to other businesses, INCA enjoyed the benefits of state favoritism. This practice is also contrary to United States policy. Hence, to the extent that unclean hands applies to interpleader actions, see Royal School Laboratories, Inc. v. Town of Watertown, 358 F.2d 813, 817 n. 3 (2d Cir.1966), G. Bandes cannot fairly oust the Generals from their pro rata share of the interpleaded fund. Precision Instrument Manufacturing Co. v. Automotive Maintenance Machinery Co., 324 U.S. 806, 814-15, 65 S.Ct. 993, 997, 89 L.Ed. 1381 (1945).
 
 
 25
 Neither has G. Bandes demonstrated that the allocation representing the shares held by more than fifty Nicaraguan businessmen belongs to her. Like the Bandes family, these shareholders incurred a loss upon the "intervention" of INCA and there has been no showing that they have been justly compensated. Because we have determined that the sum is properly reserved for the minority shareholders, G. Bandes has no claim to that portion of the fund and therefore lacks standing to challenge either the notice provision or the judgment that the unclaimed funds will escheat to the state.[5] See Valley Forge Christian College v. Americans United for Separation of Church and State, Inc., 454 U.S. 464, 471-76, 102 S.Ct. 752, 757-60, 70 L.Ed.2d 700 (1982); Sierra Club v. Morton, 405 U.S. 727, 734-740, 92 S.Ct. 1361, 1365-68, 31 L.Ed.2d 636 (1972). Cf. Kane v. Johns-Manville Corp., 843 F.2d 636, 641-46 (2d Cir.1988). The lower court properly distributed to G. Bandes 72.9% of the H & J fund, consistent with the family's pro rata portion of INCA's shares.
 
 
 26
 Alvarez's claims are also unpersuasive. He contends the Bandes family should not receive any portion of the fund because Salvador Bandes, as representative of the family, failed to exhaust administrative remedies available in Nicaragua to contest the taking. As Judge Owen noted, however, the alleged remedies may well be deemed illusory. Bandes, 570 F.Supp. at 963. To avail himself of the process, Salvador Bandes was required to appear in Nicaragua and answer criminal charges resulting from Decree No. 10, enacted after his departure. Our Constitution forbids, as ex post facto, legislation "which imposes a punishment for an act which was not punishable at the time it was committed; or imposes additional punishment to that then prescribed." Cummings v. Missouri, 71 U.S. [4 Wall.] 277, 325-26, 18 L.Ed. 356 (1867), quoted in Weaver v. Graham, 450 U.S. 24, 28, 101 S.Ct. 960, 964, 67 L.Ed.2d 17 (1981). As with takings without compensation, we are mindful of the fact that constitutional prohibitions apply only to our domestic governments. Nonetheless, courts should avoid extending the effects of another country's ex post facto legislation within our borders. We conclude that Decree No. 10 belies the existence of a bona fide administrative remedy. Cases which hold that an individual charged with a criminal violation must make a personal appearance or forego the right to challenge the forfeiture of property in a related proceeding are, accordingly, inapposite. See, e.g., United States v. $45,940 in United States Currency, 739 F.2d 792 (2d Cir.1984) (Canadian who remained a fugitive from justice in a United States prosecution was barred from pursuing his claims in a related forfeiture proceeding). Accord United States v. $129,374 in United States Currency, 769 F.2d 583 (9th Cir.1985), cert. denied sub nom. Geiger v. United States, 474 U.S. 1086, 106 S.Ct. 863, 88 L.Ed.2d 901 (1986); Schuster v. United States, 765 F.2d 1047 (11th Cir.1985).
 
 
 27
 Alvarez also offers two valuation arguments to deny the Bandes family their allotted share. He claims, first, that the Bandeses have already been more than fully compensated for their losses. The Bandes family, Alvarez explains, diverted nearly two million dollars of money belonging to INCA into their own pockets, in spite of the fact that INCA was worth far less than that amount when it was "intervened." He thus concludes that the court should not award the Bandes family any part of the H & J fund.
 
 
 28
 This argument assumes a much broader scope for this proceeding than we are willing to afford. Alvarez requests our courts to undertake the task of determining the total value of INCA in Nicaragua. The issue before us, however, is the disposition of only one of INCA's assets--the debt representing the shipment owed by H & J. The taking without compensation of the property of a United States corporation located in the nationalizing country may require a valuation of the seized property where the corporation is seeking reimbursement. See, e.g., Banco Nacional de Cuba v. Chase Manhattan Bank, 658 F.2d 875, 893-94 (2d Cir.1981) (valuation of branches of a United States bank seized by Cuban government). But, where the property in dispute is of known value located within our territorial reach, it is unnecessary to attempt the difficult process of assessing the foreign corporation's worth.
 
 
 29
 The related challenge asserts that the interpleaded fund should be applied to repay preintervention debts owed by INCA rather than distributed as a profit to the shareholders. This point, however, is a variation of a theory rejected by this Court in United Bank Limited v. Cosmic International, Inc., 542 F.2d 868 (2d Cir.1976), arising from the nationalization of companies after Bangladesh proclaimed its independence from Pakistan. That dispute concerned payments owed by a United States company, Cosmic International, Inc., for the purchase of jute from businesses that had since been confiscated by the new state of Bangladesh. Both the confiscators and two Pakistani banks, successors in interest to the seized companies, claimed payments from Cosmic. In an attempt to dislodge the Pakistani banks' claims, the confiscators argued that the situs of the Cosmic debts was in Bangladesh because they were actually security for previous debts located there. The Court disagreed, holding that the Bangladesh confiscators should not be allowed to accomplish in an indirect manner a result that was unavailable directly. "The act of state doctrine," the Court reasoned, "was not intended to permit foreign governments to circumvent American public policy." United Bank Limited, 542 F.2d at 876.
 
 
 30
 Nicaragua argues from a similar posture. If Nicaragua had tried to confiscate the sum held by H & J through nationalization, no court would have given effect to its efforts. Nicaragua is now seeking to obtain the same result through the back door--by confiscating INCA and then collecting its extraterritorial debts. United States policy demands our Court refuse that convolution.
 
 
 31
 Alvarez's final claim addresses the legitimacy of confiscation during times of emergency. Certainly, a myriad of decisions have addressed the principle that confiscation of enemy properties is not in conflict with any constitutional prohibition. United States v. Chemical Foundation, Inc., 272 U.S. 1, 47 S.Ct. 1, 71 L.Ed. 131 (1926); United Bank Limited, 542 F.2d at 876-77; see Stoehr v. Wallace, 255 U.S. 239, 242-45, 41 S.Ct. 293, 295-96, 65 L.Ed. 604 (1921); Miller v. United States, 78 U.S. [11 Wall.] 268, 304-06, 20 L.Ed. 135 (1871); Brown v. United States, 12 U.S. [8 Cranch] 109, 3 L.Ed. 504 (1814). But in those few instances throughout our history when Congress has granted to the Executive the power to seize, it has been for a circumscribed period of time and for a restricted rationale. Exercising the power has always been statutorily limited to "particular circumstances such as 'time of war or when war is imminent,' the needs of 'public safety' or of 'national security or defense,' or 'urgent and impending need.' " Youngstown Sheet & Tube Co. v. Sawyer, 343 U.S. 579, 598, 72 S.Ct. 863, 891, 96 L.Ed. 1153 (1952) (Frankfurter, J. concurring) (holding that the President could not, by Executive Order, temporarily seize most of the nation's steel mills to avoid an impending strike). Moreover, these cases speak to a different question: When is our Executive branch empowered to confiscate property? Nothing in this limited power even remotely suggests that a foreign sovereign's seizures of property located here will be recognized by our courts. See United Bank Limited, 542 F.2d at 877. On the contrary, such war time appropriations are tolerable only in the most extreme of circumstances where there is express Congressional authority given to the Executive. We decline to extend that principle to apply to another nation's extraterritorial seizures.
 
 III. Attorney's Fees
 
 32
 In its order implementing distribution of the fund, the district court awarded Alvarez his attorney's fees and expenses, amounting to $51,811.67, reasoning he had created a fund for the benefit of the preferred and minority shareholders of INCA. This award, however, contravenes the general policy in United States courts that each party bear the cost of his own counsel's compensation. See Alyeska Pipeline Serv. Co. v. Wilderness Society, 421 U.S. 240, 247, 95 S.Ct. 1612, 1616, 44 L.Ed.2d 141 (1975). Statutory provisions, of course, may carve out exceptions to the rule and authorize courts to award attorney's fees. See, e.g., Civil Rights Attorney's Fees Awards Act of 1976 Sec. 2, 42 U.S.C. Sec. 1988 (1982); Federal Water Pollution Control Act Sec. 505(d), 33 U.S.C. Sec. 1365(d) (1982), amended by Pub.L. 100-4, 100 Stat. 49, 73, 75, 76, 33 U.S.C.A. Sec. 1365(d) (1988); Securities Exchange Act of 1934, 15 U.S.C. Secs. 78i(e), 78r(a) (1982). In addition, courts have a traditional power of equity to grant fees when a successful litigant creates or preserves a "common fund" that benefits non-participants in the legal action. See Trustees v. Greenough, 105 U.S. (15 Otto) 527, 532, 26 L.Ed. 1157 (1882); see, e.g., Central Railroad & Banking Co. v. Pettus, 113 U.S. 116, 5 S.Ct. 387, 28 L.Ed. 915 (1885); Sprague v. Ticonic National Bank, 307 U.S. 161, 59 S.Ct. 777, 83 L.Ed. 1184 (1939); Mills v. Electric Auto-Lite Co., 396 U.S. 375, 389-97, 90 S.Ct. 616, 624-28, 24 L.Ed.2d 593 (1970). But, as the Court has noted, these exceptions are limited: Congress "has [not] extended any roving authority to the Judiciary to allow counsel fees as costs or otherwise whenever the courts might deem them warranted." Alyeska, 421 U.S. at 260, 95 S.Ct. at 1623.
 
 
 33
 There is no justification for providing fees here. While Alvarez demonstrated some solicitude for the plight of the unrepresented shareholders, he did nothing to create the common fund. Indeed, any benefit to the unrepresented shareholders was purely incidental to Alvarez's objective in pursuing the litigation. Cf. Central Railroad, 113 U.S. at 124, 5 S.Ct. at 391. Accordingly, the award of attorney's fees should be reversed.
 
 IV.
 
 34
 In sum, we find the distribution equitable and affirm. Because there is no apparent justification for awarding Alvarez attorney's fees, however, that portion of the judgment must be reversed.
 
 
 
 *
 Hon. William C. Conner, United States District Judge, United States District Court for the Southern District of New York, sitting by designation
 
 
 [1]
 This Court has previously commented that "intervention" is a euphemism for confiscation without meaningful compensation. Menendez v. Saks and Company, 485 F.2d 1355, 1360 n. 1 (2d Cir.1973), cert. denied in part, 425 U.S. 991, 96 S.Ct. 2201, 48 L.Ed.2d 815 rev'd on other grounds sub nom. Alfred Dunhill of London, Inc. v. Republic of Cuba, 425 U.S. 682, 96 S.Ct. 1854, 48 L.Ed.2d 301 (1976). The lower court noted that there was a "fundamental dispute" over the term regarding whether it was a permanent or temporary taking. Because, during the nine years of this litigation, INCA has been solely controlled by the Sandinista Government without any attempt to indemnify the Bandes family, we conclude that the company has been expropriated to the extent of permanent ownership and control over the Bandeses's property
 
 
 [2]
 The text of all decrees reprinted here is taken from the lower court opinion, Bandes v. Harlow & Jones, 570 F.Supp. 955, 957-59 nn. 1-2 & 5-8 (S.D.N.Y.1983). The lower court took the text from La Gaceta, the official journal of the Government Council. The original appears in Spanish. The translation used was provided by interpleader defendant Alvarez
 
 
 [3]
 Decree No. 10, titled "Law of National Emergency," states, in pertinent part:
 Art. 2. There will be a penalty from 3 months to 2 years of public service for those that incur any of the following crimes: ...
 b) The presidents, directors, managers, administrators and heads of departments and/or those responsible for any working equipment in private business that refuse to go back to work, abandon it or hinder the working of these businesses ...
 * * *
 Art. 7. The state is hereby empowered, through the competent authorities, to intervene those businesses whose proprietors abandon them or refuse to put them back in operation.
 
 
 [4]
 Subsequent government decrees also affected INCA. Decree No. 172, issued on Nov. 21, 1979, provided that the Attorney General should have the sole power to try cases involving "intervened," but not confiscated, property. INCA, at that time, had not been adjudged confiscated although it clearly had been "intervened." On Feb. 7, 1980, Decree No. 282 was published, requiring any person who wished to contest intervention to appear personally before the Attorney General within an unextendable period of 30 days. Failure to appear, the decree continued, would result in a loss of rights in the property and escheatment to the state. Accordingly, if Bandes sought to challenge the confiscation, he or a member of his family would have had to return to Nicaragua and face criminal charges imposed by Decree No. 10. None of the Bandeses appeared before the Attorney General within the allotted period to contest the taking
 On May 2, 1980, well beyond the 30 days allowed by Decree No. 282, the Government Council enacted Decree No. 422, requiring the Attorney General to institute an action in the Nicaraguan courts to effect a confiscation. Although no judicial proceeding appears to have occurred, the Nicaragua authorities seem to be proceeding on the premise that the ownership of INCA already passed to them by forfeiture. Bandes, 570 F.Supp. at 959.
 
 
 [5]
 Although this Court has previously declined to implement escheatment provisions where a countervailing United States policy can be furthered, that principle does not apply here. For example, in Banco Nacional de Cuba v. Chemical Bank New York Trust Co., 658 F.2d 903 (2d Cir.1981), appellant Banco Nacional, the successor in interest to private Cuban banks nationalized twenty years before, sought to recover deposits made by those institutions held in certain United States banks. Each of the defendant banks counterclaimed, alleging that another confiscated company, the Cuban Electric Company, had outstanding balances on loans that exceeded the amount of Banco Nacional's claims. Reasoning that the United States policy would be furthered by permitting recovery on the counterclaims, the Court held that the act of state doctrine does not bar recognition of Banco Nacional's right to sue. The Court also realized that, if it had denied Banco Nacional's claims, the deposits would have escheated to New York, a result which would not have "further[ed] the established national policy." Banco Nacional, 658 F.2d at 909
 That case is not dispositive of the issue before us. Here, escheatment would not preclude the parties from collecting their portions of the fund. Only any unclaimed remainder would escheat to New York as abandoned property. Unlike Banco Nacional, escheatment would countermand no national policy, nor would denying escheatment further any policy.