Victor Fernandez CASTRO,
et al., Petitioners,

v.

**ITT CORPORATION (a Delaware
corporation), Respondent.**

Civ. A. No. 11531.

Court of Chancery of Delaware,
New Castle County.

Submitted: Feb. 8, 1991.
Decided: May 30, 1991.
Revised: May 31, 1991.

Bertram S. Halberstadt, Wier & Halberstadt, Wilmington (Harry A. Ezratty, and Philip E. Roberts, San Juan, Puerto Rico, Ismael Marrero, Hato Rey, Puerto Rico, of counsel), for petitioners.

Allen M. Terrell, Jr., and David L. Finger, Richards, Layton & Finger, Wilmington, for respondent.

## OPINION

ALLEN, Chancellor.

Cross motions for summary judgment have been presented in this action seeking to compel a Delaware corporation to issue stock certificates and to pay cash dividends that the issuer has accumulated and holds for the owner of the shares in question. The shares are registered in the name of a Cuban partnership, Fernandez Castro and Company, S en C. Petitioners assert in the affidavit of Victor Fernandez Castro that they constitute all of the general partners (or the heirs of the general partners) of Fernandez Castro and Company, S en C (the "Partnership"); that the Partnership was seized, without compensation, by the government of the Republic of Cuba in 1962; and that they are the true owners of property held in the United States in the name of the Partnership.

More specifically, according to the affidavit of Mr. Fernandez Castro, the relevant facts appear as follows:

On March 7, 1962, armed representatives of the revolutionary government of Cuba arrived at the Partnership's place of business in Havana and, purporting to act by law and as part of a general seizure of the paper and printing industry, forcibly seized the Partnership in the name of the Republic of Cuba. No compensation was paid.

Fernandez Castro and Company, S en C had been in business since 1851. At the time of the seizure there were three general partners of the Partnership: Victor Fernandez Castro (the petitioner), his uncle, Manuel Fernandez Gonzalez, and his cousin, Gonzalo Rodriguez Lopez. The Partnership had a limited (silent) partner: Eladio Blanco Fernandez. According to the petitioners, each general partner held a 30% interest in the Partnership, and Eladio Fernandez held a 10% interest.

In the 1920s the Partnership had started investing in a small way in the shares of International Telegraph & Telephone Corporation (now ITT Corporation). By the time of the Cuban government's seizure, the Partnership owned some 2,226 shares of ITT common stock which were registered in the name of the Partnership. The certificates were held by Mr. Blanco Fernandez for the Partnership, but he, it is said, had no beneficial interest in them.

Within a few months of the seizure, Mr. Fernandez Castro emigrated to the United States and thereafter became a citizen of this country. The other petitioners in this action are alleged to be the heirs of his two relatives who were the other general partners in the Partnership.

Following the establishment of the revolutionary government in Cuba and its seizure of the Partnership, the United States government, in July 1963, froze all assets of Cuban nationals or entities located in the

United States. Thereafter, in 1968, ITT declared a two-for-one stock dividend. Because of the blocking order, however, it has never delivered that stock dividend, or later cash dividends on the original 2,226 shares, to the Partnership but has held them, apparently in a segregated account. Now held by ITT are 2,226 dividend shares and more than $180,000 (as of 1989) in cash dividends.

In July 1989, Mr. Fernandez Castro succeeded in having the U.S. Treasury Department's Office of Foreign Asset Control issue an unblocking license [1] stating in part:

> ITT Corporation is hereby authorized to unblock one-forth (¼) of the shares and all accumulated dividends thereon, of ITT common stock registered in the name of "Fernandez Castro y Compania S en C" and distribute the *1,113* shares and related dividend income to Victor Fernandez Castro.[2]

On March 2, 1990, a similar license was issued to the wife (Marina P. Rodriguez) and daughter (Ana Rodriguez) of Gonzalo Rodriguez Lopez (who died in Cuba in 1966), covering 1,113 ITT shares plus 25% of accumulated dividends.

On June 1, 1990, the Estate of Manuel Fernandez Gonzalez (who died in Spain in 1979) was granted a similar license for 1,113 shares and appurtenant dividends. The license listed six individuals as beneficiaries of the estate to whom ITT was permitted to make payments.

At the time the petition was filed, it was alleged that over the years no claims or communications had been made to ITT with respect to these shares by anyone other than petitioners.[3]

Petitioners have demanded that ITT transfer the property in question to them as authorized by the Department of Treasury licenses. The Company declined to do so. It insisted that petitioners furnish it with a surety bond that would fully protect it in the event that a later owner should appear. At the same time, the Company acknowledged that such a bond was not commercially available where property affected by a Cuban seizure was involved.

Petitioners then initiated this action.

\* \* \*

Petitioners characterize their suit as one arising under Section 168 of the Delaware General Corporation Law. That section provides a procedure by which the "lawful owner" of shares can compel the issuance of new certificates upon proof that his certificates have been lost, stolen or destroyed. As a condition to such relief, Section 168 requires the court to fix a bond in an amount thought sufficient to protect the corporation. The statute limits the liability of the corporation to other claimants thereafter.

Petitioners' core position is that they can prove themselves to be the equitable owners of the original shares; that those shares are property located in the U.S. (*i.e.*, in Delaware); and that the United States Constitution requires that the confiscatory act of the Cuban government be denied any extraterritorial effect in this country. Thus, they conclude that under these circumstances, ITT and this court are obligated to recognize them as the lawful owners of the partnership's property located in the U.S. If their claim to beneficial ownership is provable, they say, then to fail to recognize it would be to accord an illicit seizure the dignity of a valid act of state, something courts in similar cases have refused to do.

The corporation resists the relief, asserting that since petitioners are not the registered owners of the Company's stock, it is under no obligation to recognize their "eq-

---

**1.** Under the authority of Section 620A of P.L. 87–195 and Section 5(b) of the Act of October 6, 1917, as amended.

**2.** The Treasury Department authorized the delivery to Mr. Fernandez Castro of 25% of *all* ITT stock registered to the Partnership on the theory that there were three general partners and one limited partner in the Firm.

**3.** However, as noted below, since that time an individual has come forward with possession of certificates for 400 shares registered in the name of the Partnership. That person purports to have information regarding other certificates.

uitable" claims to ownership. Secondly, the Company asserts this court has no jurisdiction over this matter because this matter is essentially one to determine legal title to property over which, they say, Chancery has historically not assumed jurisdiction. Finally, respondent asserts that the Republic of Cuba is an entity with an interest in this action in whose absence the claim must be dismissed.

■ For the reasons that follow, I conclude that petitioners are entitled to an adjudication in this court of their claimed right to the issuance of certificates for the ITT stock in issue here. That is, I cannot accept respondent's assertion that one who is not a registered owner of stock has no standing to bring a Section 168 action. I also reject the assertion that this court has no subject matter jurisdiction with respect to this claim[4] and that the Republic of Cuba is an indispensable party to this litigation. Thus, I conclude that respondent's motion for summary judgment must be denied. With respect to petitioners' motion, I conclude that the matter has not been put into an appropriate posture procedurally in order to determine factually, the claim to "lawful owner[ship]," 8 *Del.C.* § 168, or the appropriate bond, if such claim is established.

## I.

■ I turn first to the question whether the fact that the original shares are registered to a foreign entity and not to petitioners precludes the relief sought.

■ In a number of circumstances the Delaware corporation law permits a corporation to rely exclusively upon its stock ledger in order to determine who are its stockholders. *See, e.g.,* 8 *Del.C.* § 219(c) (stock ledger "shall be the only evidence as to who are the stockholders entitled ... to vote ..."); 8 *Del.C.* § 220 (defining stock-

holders entitled to inspect books and records as "a stockholder of record"); and 8 *Del.C.* § 222(b) (notices to stockholders). This rule of expediency, however, does not pertain to rights under Section 168. The language of that section makes it apparent that the "owners" that have rights under that section are not limited to "registered owners." Section 168 provides in part as follows:

> (a) If a corporation refuses to issue new uncertificated shares or a new certificate of stock in place of a certificate theretofore issued by it ... alleged to have been lost, stolen or destroyed, *the owner of the lost, stolen or destroyed certificate* or his legal representatives may apply to the Court of Chancery for an order requiring the corporation to show cause why it should not issue new uncertificated shares or a new certificate of stock in place of the certificate so lost, stolen or destroyed.
>
> *       *       *       *       *       *
>
> (b) If, upon hearing, the court is satisfied that *the petitioner is the lawful owner* of the number of shares of capital stock, or any part thereof, described in the petition, and that the certificate therefor has been lost, stolen or destroyed, and no sufficient cause has been shown why new uncertificated shares or a new certificate should not be issued in place thereof, it shall make an order requiring the corporation to issue and deliver to the petitioner new uncertificated shares or a new certificate for such shares. (emphasis added)
>
> *       *       *       *       *       *

The statutory language "owner" or "lawful owner," when read against other provisions of the corporation law that specifically refer to "stockholder of record," cannot sensibly be interpreted to mean "registered owner." Indeed, the statutory language itself makes this conclusion unavoidable

---

**4.** That this court has such jurisdiction appears obvious even if one were to accept the proposition that this is not a Section 168 case. *Cf. Scott v. Ametek, Inc.,* Del.Ch., 277 A.2d 714 (1971). In all events, petitioners seek mandatory injunctive relief, and in no event may their action be characterized as simply a dispute about *legal* title. The essence of petitioners' claim is that they do not have legal title but can establish equitable title that in the circumstances is sufficient to qualify them as "owners" or "lawful owners" under Section 168. This classically is a matter for a court of equity.

when, in Section 168(a), it goes on to require the petitioner to allege "to whom [the stock in question was] issued." 8 *Del.C.* § 168(a). Obviously such a pleading requirement would be purely redundant if, in order to be a proper petitioner (to have standing to use respondent's conception), one were required to be the person to whom the stock had been issued.

There are commonly occurring situations in which, by reason of death, dissolution, or merger of the registered owner or transfer[5] by it, a person other than the registered owner will, upon appropriate proof, be recognized as the owner of lost certificates under Section 168.[6]

■ Thus, for purposes of Section 168, registration on the issuer's stock ledger as the owner is not critical; the substance of petitioners' claim to be the "lawful owner" of lost, stolen or destroyed certificates is. Once the mechanical test of registration is discarded, no simple or abstract test of "lawful owner" suggests itself. Rather an inquiry into the specifics of the claim seems necessary.

Respondent turns to the specifics here and asserts that whether petitioners are "lawful owners" is governed by Cuban law, since the Partnership is a Cuban entity. Respondent asserts that petitioners have not shown that they, as general partners (or former general partners) of this entity, now hold (or then held) any right to the property of the entity. For all that appears, respondent says, the Partnership continues to exist and its present owner— presumably the Republic of Cuba pursuant to its sovereign act of seizure—and not petitioners have rights to the property at issue. Thus, it is said that under Cuban law petitioners have not shown themselves to be "lawful owners."

While this argument would not justify a summary judgment against petitioner in any event (since it raises but does not answer questions), it does highlight several factual and legal questions. Does the Partnership still exist? Does it matter for present purposes whether it legally exists or does not? Can the seizure be interpreted as a dissolution of the Partnership and a seizure of its assets? Perhaps most fundamentally, was any compensation (or fair compensation) paid in exchange for the seized assets? I refer to this last question as fundamental because if, in fact, just compensation was paid, then the Act of State Doctrine may require that this court regard that seizure as valid for purposes of determining who owns the Partnership's property that is fictively, but legally, located in this jurisdiction. *See Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398, 84 S.Ct. 923, 11 L.Ed.2d 804 (1964). If, however, no compensation were paid (or no just compensation), then our federal Constitution would appear to dictate that the act of seizure be accorded no effect by courts of this country. In that event, it would not matter for present purposes whether under Cuban law the Partnership does or does not still exist.

■ To support the assertion that under our law the Cuban government's seizure of the Partnership could not affect the equitable ownership of the original shares, two propositions must be established. The first is that acts of a foreign sovereign are not immune from judicial review to the extent those acts purport to affect property located outside of the territory of the foreign sovereign. This proposition is well established:

> [O]ur courts will not give "extra-territorial effect" to a confiscatory decree of a foreign state, even where directed against its own nationals.

---

5. *See Bartlett v. General Motors Corp.*, Del.Ch., 127 A.2d 470 (1956) (Corporation required to cancel stock and issue new certificate in different name following execution sale).

6. The obverse is also true. In a series of Section 168 cases, the courts of this State have recognized that an issuer may, in some circumstances, require that a registered owner establish its beneficial ownership before the corporation is obligated to issue a new certificate. *See Merrill Lynch Pierce Fenner & Smith, Inc. v. North European Oil Royalty Trust*, Del.Supr., 490 A.2d 558, 563 (1985); *Keech v. Zenith Radio Corp.*, Del.Ch., 276 A.2d 270, 273 (1971); *In re Metropolitan Royalty Corp.*, Del.Super., 62 A.2d 857, 858 (1948).

*Maltina Corp. v. Cawy Bottling Co.,* 462 F.2d 1021, 1025 (5th Cir.), *cert. denied,* 409 U.S. 1060, 93 S.Ct. 555, 34 L.Ed.2d 512 (1972); *see also Tran Qui Than v. Regan,* 658 F.2d 1296, 1303–1304 (9th Cir.1981), *cert. denied,* 459 U.S. 1069, 103 S.Ct. 487, 74 L.Ed.2d 630 (1982). The rationale underpinning the extraterritorial exception to the Act of State Doctrine derives from the foundation for the doctrine itself. Since "[t]he obvious inability of a foreign State to complete an expropriation of property beyond its borders reduces the foreign State's expectations of dominion over that property[,]" *Maltina Corp.,* 462 F.2d at 1028, the potential for friction with the foreign State and the need for deference to the executive branch in dealing with it are reduced. *Tchacosh Co., Ltd. v. Rockwell Int'l. Corp.,* 766 F.2d 1333, 1337 (9th Cir. 1985). Moreover, courts are capable of enforcing judgments when the property at issue is located in United States territory. *See Id.; United Bank Ltd. v. Cosmic Int'l Inc.,* 542 F.2d 868, 873–74 (2d Cir.1976); *Tabacalera Severiano Jorge v. Standard Cigar Co.,* 392 F.2d 706, 714–16 (5th Cir.), *cert. denied,* 393 U.S. 924, 89 S.Ct. 255, 21 L.Ed.2d 260 (1968). In sum, "the policies mandating a hands-off attitude no longer apply with the same force" when the property is located in the United States. *Bandes v. Harlow & Jones, Inc.,* 570 F.Supp. 955, 960 (S.D.N.Y.1983), *rev'd on other grounds,* 852 F.2d 661 (2d Cir.1988). Thus, our courts have not felt bound by the Act of State doctrine to recognize the sovereign character of acts of foreign governments purporting to affect ownership of property located within the territory of the United States.

■ The second related proposition is that courts in this country will not respect the act of a foreign government that amounts to a confiscation—a taking without just compensation. A number of cases are instructive here, but none more so than *Zwack v. Kraus Bros. & Co.,* 237 F.2d 255 (2d Cir.1956). In *Zwack* the Hungarian government had seized a Hungarian partnership, J. Zwack & Co. Petitioners were partners in the partnership prior to its seizure. Respondent was a New York corporation that held a license from the partnership and owed it royalties from the war years (a freeze order of the national government had required the respondent to accumulate its payments). Thus, the structure of *Zwack v. Kraus* bears a striking resemblance to the structure of this case.

In *Zwack,* the partners of the pre-seizure firm sued the New York corporation to collect the royalties owed, for an accounting, and for cancellation of the license (so that they could produce or sell trademarked items in the U.S.). Among other defenses asserted was the claim that petitioners had no standing, under Hungarian law, to press these claims. The Court of Appeals restated the issue as follows:

> Before we can deal with the merits of the controversy we must dispose of a serious question concerning the petitioners' standing to bring this suit. Under applicable Hungarian law, which regards a partnership as an entity, the individual partners *have no individual rights in the firm assets.* Therefore, the petitioners' standing to sue can only be based on their claims to sue as partners on behalf of the firm. The respondent seeks to analogize the Hungarian entity concept of the partnership to the American concept of the corporation and argues that the partner's interest in the firm assets *consists wholly of a claim of ownership in the firm having its exclusive situs at the firm residence in Hungary.* It urges that the transfer of the petitioners' shares of ownership was accomplished in Hungary by official acts of the Hungarian government and therefore is not subject to collateral attack outside of Hungary even if confiscatory and therefore against the public policy of the forum. They cite *Underhill v. Hernandez,* 168 U.S. 250, 18 S.Ct. 83, 42 L.Ed. 456; *Banco de Espana v. Federal Reserve Bank,* 2 Cir., 114 F.2d 438; and *Bernstein v. Van Heyghen Freres Societe Ananyme,* 2 Cir., 163 F.2d 246, 249. In reliance on this doctrine the respondent contends that the petitioners have no standing to sue and the action should have been dismissed.

*Zwack v. Kraus Bros.*, 237 F.2d at 258 (emphasis added).

The Court of Appeals rejected this contention:

> We think that, where firm assets existing in the forum are concerned, technical considerations as to the manner in which the foreign state seeks to expropriate them are not controlling. *Prior to confiscation* the assets of the firm both here and in Hungary were *equitably owned by the petitioners* as the sole partners in the firm. It is clear that the Hungarian government *could not directly seize the assets* which have a situs in the state of the forum. To allow it to do so indirectly through confiscation of firm ownership would be to give its decree extraterritorial effect and thereby emasculate the public policy of the forum against confiscation. This we decline to do. *See* 57 *Yale Law Journal* 108. We sustain the petitioners' standing to bring and prosecute the petition here involved.

*Id.* (emphasis added)

*Zwack* is in no sense an eccentric case. Rather, it fairly reflects the tendency of courts to put technicalities to the side when dealing with the domestic consequences of foreign seizures without just compensation. *See, e.g., Maltina Corporation v. Cawy Bottling Company*, 462 F.2d 1021 (5th Cir. 1972) (corporation dissolved by sovereign act in Cuba maintained existence in U.S. at instance of controlling shareholder); *Bandes v. Harlow & Jones, Inc.*, 852 F.2d 661 (2nd Cir.1988) (former majority shareholders of seized Nicaraguan corporation had equitable right to debt owed by a Connecticut corporation even against claim of the corporation itself).

The principle of *Zwack* and the other cited cases—that U.S. domestic law ought not to facilitate indirectly the seizure by a foreign government without just compensation of property located in the U.S.—is applicable to the facts alleged in the verified petition. In light of this wholesome principle of law, I cannot conclude that petitioners have no standing to bring this action. Rather, I conclude—putting aside for the moment questions of bond, of notice

to others, and the validity of other claims—that if petitioners prove the allegations they make, they will be entitled to relief under Section 168.

## II.

■ The issues in this case do not arise only from the fact that the original shares were registered in the name of a foreign legal entity. Since the certificates representing the original shares are both negotiable and "lost," rights of other possible holders and rights and duties of the issuer with respect to any holder of those certificates may have a bearing on the proper disposition of this case, even if the certificates representing the original shares had been registered in petitioners' names individually. Thus, deciding that petitioners might prove themselves in equity to "be" Fernandez Castro and Company S en C, does not end the matter. One must inquire into the rights and obligations of the issuer with respect to a demand by the owner of lost, stolen or destroyed stock certificates to issue new certificates.

This inquiry takes its procedural significance here from the fact that respondent has asserted as one basis for summary judgment that the registered owner of the shares is, under Cuban law, now the Republic of Cuba. Thus, the Company asserts that the Republic of Cuba has an interest in this matter and that its absence exposes the Company to potentially inconsistent adjudications. Respondent concludes that the Republic of Cuba is an indispensable party in whose absence the case must be dismissed.

Inquiry into the question of the relative rights of issuers, registered owners, and holders of stock certificates is made difficult and somewhat unclear in Delaware by the fact that we have two distinct statutes that purport to govern the obligations of issuers with respect to lost stock certificates. While those statutes—Section 168 of the Delaware General Corporation Law and Section 405 of Article 8 of the Uniform

Commercial Code [7]—are in some respects parallel, in an important respect they are inconsistent. Notably, these two statutes are rooted in inconsistent premises. Article 8 seeks to promote negotiability of share certificates. To do this it attempts to merge the legal interest of stock into what might have been thought of as only evidence of that interest, the certificate.[8] The official comment to Section 8–317, for example, instructs that:

> In dealing with certificated securities, the instrument itself is the vital thing and therefore a valid levy cannot be made unless all possibility of the security's finding its way into a transferee's hands has been removed.

2A Uniform Laws Annot. § 8–317, at 521 (1991 Supp.).

The UCC thus rejected the traditional rule that permitted the seizure of stock for adjudication purposes by attachment served upon the issuer at its corporate domicile. *Compare, e.g., Harvey v. Harvey*, 290 F. 653, 658 (7th Cir.1923). Delaware had long accepted and implemented this traditional approach. The stock of corporations created under Delaware law had from an early date been deemed to be in this jurisdiction. Section 169 of the General Corporation Law continues to fix the situs of all stock of a Delaware corporation in this State for all purposes other than taxation. This fiction provides a single, certain jurisdiction in which all claimants to shares could be subjected to *in rem* or *quasi in rem* jurisdiction for the purpose of determining questions of ownership of stock.

When it enacted Article 8 of the Uniform Commercial Code, Delaware did not repeal its situs statute, Section 169. Rather it preserved it. Section 8–317(1) of the UCC which provides for attachment of certificated shares only by actual seizure of the certificate was modified. As enacted Delaware's version of 8–317(1) simply provided that:

> Nothing contained in this subtitle shall repeal, amend or in any way effect the provisions of Section 169 and 324 of Title 8 ... and to the extent [of any inconsistency] sections 169 and 324 ... shall be controlling.

Section 8–317 was amended in 1983 to adopt the 1977 amendments to Article 8. *See* 64 Del. Laws, c. 152 § 6 (1983). Under the amended section, generally, the seizure of a certificated security continues to require actual seizure of the "security" (8–317(1)) but uncertificated securities may be

---

**7.** Delaware has enacted the 1977 amended version of Article 8. *See* 6 *Del.C.* §§ 8–101, et seq. Section 8–405, provides as follows:

(1) If a certificated security has been lost, apparently destroyed or wrongfully taken, and the owner fails to notify the issuer of that fact within a reasonable time after he has notice of it and the issuer registers a transfer of the security before receiving such a notification, the owner is precluded from asserting against the issuer any claim for registering the transfer under Section 8–404 or any claim to a new security under this section.

(2) If the owner of a certificated security claims that the security has been lost, destroyed or wrongfully taken, the issuer shall issue a new certificated security or, at the option of the issuer, an equivalent uncertificated security in place of the original security if the owner:

(a) So requests before the issuer has notice that the security has been acquired by a bona fide purchaser;

(b) Files with the issuer a sufficient indemnity bond; and

(c) Satisfies any other reasonable requirements imposed by the issuer.

(3) If, after the issue of a new certificated or uncertificated security, a bona fide purchaser of the original certificated security presents it for registration of transfer, the issuer shall register the transfer unless registration would result in overissue, in which event the issuer's liability is governed by Section 8–104. In addition to any rights on the indemnity bond, the issuer may recover the new certificated security from the person to whom it was issued or any person taking under him except a bona fide purchaser or may cancel the uncertificated security unless a bona fide purchaser or any person taking under a bona fide purchaser is then the registered owner or registered pledgee thereof.

6 *Del.C.* § 8–405.

**8.** Article 8 was, of course, originally drafted before the concept of uncertificated stock was widely adopted. The emergence of uncertificated stock (which by its very nature could be perfectly consistent with the traditional corporation law concept of attachment of stock by attachment process served on the issuer) caused substantial amendment of Article 8 in 1977.

attached by legal process served upon the issuer (8–317(2)). In all events the provision of amended Section 8–317(1) are introduced by the following:

"Except to the extent otherwise provided or permitted by §§ 169 and 324 of Title 8, §§ 365, 366 and Chapter 35 of Title 10...."

Thus, it would seem apparent that the amendment of Section 8–317 in 1983 was not intended to modify the effect or operation of the situs statute (Section 169) or the attachment mechanisms employed to bring stock into court.

The different premises of the lost certificate provisions of Article 8 of the corporation statute are reflected in different concepts of seizure employed by Article 8 and Section 169. Under Section 169 (and Section 324 which authorizes attachment process) of the General Corporation Law, one seizes stock not by actual seizure of a certificate but by attachment process served at the corporate domicile. This difference leads to a significant inconsistency between the two lost certificate sections of our law—Section 168 and Section 405 of Article 8. The corporation law (Section 168) purports to limit the future liability of the issuer to any third person to the amount of the bond required.[9] It may do so since it does not assume that "the instrument itself is the vital thing." The commercial law (6 *Del. C.* § 8–405(3)), however, rather than purporting to limit the exposure of the issuer to the amount of the bond required by § 8–405(2), in fact does the reverse. It makes the issuer liable to any bona fide purchaser of the original certificate. Under the provisions of Article 8, the bond will ameliorate but not preclude future loss to the issuer. The UCC takes this tack because, valuing negotiability, it does assume the certificate itself is "the vital thing."

I assume that the Delaware amendment to Section 8–317(1), quoted above, means that the apparently unconditional right of a holder of a valid stock certificate to require a transfer of the stock on the Company's books to him and the issuance of a new certificate (Sections 8–401 and 8–405(3)) is, in Delaware, subject to a possible defense by the issuer: that the shares were adjudicated lost, stolen or destroyed and the bond that was fixed in that adjudication would be insufficient fully to cover the cost, somehow measured, of the prospective double issuance. If such a defense exists to an action under Sections 401 or 405(3) of Article 8, in Delaware, then, of course, the Article 8 goal of perfect negotiability of negotiable certificates of stock will be impaired. But that impairment may, as a practical matter, not be very significant. After all, Delaware had never adopted all of the Uniform Stock Transfer Act, and its situs statute was not a major clog on the development of effective markets. *See* Note, *Attachment of Corporate Stock: The Conflicting Approaches of Delaware and the Uniform Stock Transfer Act*, 73 Harv.L.Rev. 1579 (1960).

The effect of these considerations upon the pending matter becomes apparent when one considers the effect of the protection accorded to issuers by Section 168 in other, later actions in other jurisdictions. Suppose, for example, that this case were to reach judgment in petitioners' favor. Assume a bond is fixed in an amount equal to the present market value of the stock plus the cash dividends and that some time later a holder of the certificates of the original shares who resides in Florida[10] brings suit in the State of Florida alleging that the Company has an obligation to register the transfer of the certificates into his name under Florida's version of Section 8–401 and 8–405(3). Assume there is *in person-*

---

9. Section 168(b) provides, in part:
   No corporation which has issued uncertificated shares or a certificate pursuant to an order of the court entered hereunder *shall be liable in an amount in excess of the amount specified in such bond.* Emphasis added.

10. In this respect, the hypothetical is not wholly imaginary. The record contains an affidavit stating that the Company has recently received correspondence from a Florida resident who claims to be acting for heirs of yet another claimed partner of the Partnership who is in possession of some certificates of ITT stock registered to the Partnership.

*am* jurisdiction over the Company in Florida. Assume that the market value of ITT stock has risen in the interim, so that the principal amount of the bond could not fully reimburse the Company for the cost (measured at market) of the double issuance that would result if the petition is granted,[11] and assume that the Company argues that the judgment of this court and Section 168 of the Delaware General Corporation Law deserve to be accorded full faith and credit by the Florida court and that they preclude the relief sought, to the extent it would exceed the principal amount of the bond.

If that plea is no good, then the attempt of Delaware to invoke its situs statute to govern the rights and duties between a domestic corporation and its shareholders and to protect issuing corporations through the bond requirement, will fail of its purpose. There are several arguments why the plea might be rejected. So far as I apprehend, the only way in which the Florida court might be considered bound to respect such a plea would be upon the conclusions that the action in Delaware was an action *in rem* (the underlying shares being the property in question) and that the hypothetical Florida petitioner was bound by the judicial determination of "lawful ownership" of the shares in that action. This might plausibly be concluded,[12] but in no event could it be done if there had been no notice to the world of the scope of the Delaware action and an oppor-

tunity to appear in it. *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 70 S.Ct. 652, 94 L.Ed. 865 (1950).

Thus, while I cannot accept respondent's argument that the absence of the Republic of Cuba as a party to this action mandates dismissal under Rule 19, I am of the opinion that a mechanism, including publication of notice in Havana and Miami, should be devised so that third persons claiming any ownership rights in the original shares might be notified and afforded a chance to be heard.[13] Any such person that appears will, of course, be bound by the judgment entered. If the notice is reasonable in the circumstances, any person who does not appear, but who holds a negotiable certificate of stock which, under Section 8–405(3) of the Uniform Commercial Code, would ordinarily carry with it the right to require a transfer, could then, under the full fair and credit clause, be bound in a limited way to the Delaware adjudication.[14] This would mean that with respect to such a holder, the limitation on issuer liability under 8 *Del.C.* § 168 would obtain and she would in effect be bound by the judgment to the extent that the value of her certificates exceed the amount of the bond fixed in the Delaware action.

\*   \*   \*   \*   \*   \*

I make a concluding note. A more elaborate procedure than petitioners envisioned is called for here because one cannot say *ex ante* that the bond to be fixed will be

---

**11.** I put aside the questions that arise from potential over-issues which are dealt with by Sections 8–405(3) and 8–104 of the Code.

**12.** *See Shaffer v. Heitner*, 433 U.S. 186, 208, 97 S.Ct. 2569, 2581, 53 L.Ed.2d 683 (1977). The Florida court would have to determine that there was a relationship between the state of incorporation, the question who is the lawful owner of shares of stock in a domestic corporation, and all persons claiming an ownership interest in the stock, such that maintaining an action limited to a determination of ownership rights in the shares is consistent with traditional motions of fair play and substantial justice. Given the traditional rule on this question (*see* 11 Fletcher, *Cyclopedia Corporations* § 5101, at 109 (Perm. ed. 1986)), the fact that that rule does give fair notice (*compare Harris v. Balk*, 198 U.S. 215, 25 S.Ct. 625, 49 L.Ed. 1023 (1905) which the *Heitner* court specifically disavowed

and which gave no notice to a creditor where his debt might be attached) and the pure *in rem* extent of the action, one could, I suggest, safely predict that the United States Supreme Court would affirm such a conclusion. *See Burnham v. Superior Court*, 495 U.S. 604, 110 S.Ct. 2105, 109 L.Ed.2d 631 (1990) (Scalia, J.); *see also Sternberg v. O'Neil*, Del.Supr., 550 A.2d 1105, 1116 (1988).

**13.** I express no opinion on whether the formality (for such it would be in the circumstances) of seizure as authorized by 8 *Del.C.* § 324 should be employed here.

**14.** This court cannot authoritatively determine whether *res judicata* will in fact be granted, or full faith and credit accorded, to its judgment. That matter will always present an issue for the later tribunal.

sufficient both to fully protect the interests of the issuer in any subsequent action in another jurisdiction and to fully protect later discovered valid claims for registration of transfer in this or another jurisdiction. To view the matter in this way ought not, however, to distract one from the recognition that the primary protection to all interests affected is provided by the bond itself. On the facts of this case, where it appears that perhaps no bond will be commercially available, but where there is some recent indication of the location of the certificates, prudence suggests that an agreement in accordance with U.S. law be reached between petitioners and those who have access to the certificates that permits the certificates to be tendered for transfer to petitioners.

In all events, on the present record the cross motions must be denied.