IN THE SUPREME COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| GERMANINVESTMENTS AG, and RICHARD HERRLING, individually and on behalf of AHMR GmbH, | § § § § | No. 291, 2019 |
| Plaintiffs-Below, Appellants, | § § § | |
| v. | § § § | Court Below: Court of Chancery of the State of Delaware |
| ALLOMET CORPORATION, and YANCHEP, LLC, | § § § | C.A. No. 2018-0666-JRS |
| Defendants-Below, Appellees. | § § § | |

Submitted:  December 11, 2019
Decided:  January 27, 2020

Before **SEITZ**, Chief Justice; **VALIHURA** and **TRAYNOR**, Justices.

Upon appeal from the Court of Chancery.  **AFFIRMED**, in part, **REVERSED**, in part, and **REMANDED**.

R. Craig Martin, Esquire, (*argued*) Kelly L. Freund, Esquire, DLA Piper LLP, Wilmington, Delaware for Appellants.

John P. DiTomo, Esquire, (*argued*) Ryan D. Stottmann, Esquire, Coleen W. Hill, Esquire, Morris, Nichols, Arsht & Tunnell LLP, Wilmington, Delaware for Appellees.

**VALIHURA**, Justice:

In this case, we consider whether the Court of Chancery correctly determined that a provision in a Restructuring and Loan Agreement between the parties (the "R&L Agreement") is a mandatory, as opposed to a permissive, forum selection clause. That clause reads: "The agreement is subject to Austrian law. The place of jurisdiction is Vienna." The Court of Chancery held that Austrian law governs the analysis of the forum selection provision, and determined that the provision is governed by Article 25 of the European Regulation on Jurisdiction and Recognition and Enforcement of Judgments in Civil and Commercial Matters (the "Brussels Regulation"). Applying Article 25 of the Brussels Regulation, it held that the forum selection clause was mandatory. Based upon these conclusions, the court granted Defendants' Rule 12(b)(3) motion to dismiss, without prejudice, in favor of the Vienna, Austria forum.

We hold that the Appellees, who raised Austrian law as a basis for their motion to dismiss, had the burden of establishing the substance of Austrian law.[1] We further hold that, given the complexity of the foreign law issues raised and the absence of any focused and orderly engagement by the parties on these issues, the Court of Chancery erred in determining that Appellees had carried that burden. Accordingly, we hold that, given the Appellees' failure of proof, the forum selection provision analysis should proceed exclusively under

---

[1] This basic proposition is not in dispute. *See* Oral Argument Video at 19:48–19:55, https://livestream.com/DelawareSupremeCourt/events/8915746/videos/199787022:

> Justice Valihura: You agree that it is your burden to establish what the substance of the foreign law is?
>
> Counsel for Appellees: Oh absolutely, Your Honor.

2

Delaware law. Applying Delaware law, the forum selection provision is merely permissive, not mandatory. As such, the forum selection provision is no bar to the litigation proceeding in Delaware. We affirm the Court of Chancery's holding that 8 *Del. C.* § 168 was not the proper mechanism for the relief Appellants seek. Therefore, this matter is **AFFIRMED** in part, **REVERSED** in part, and **REMANDED** to the Court of Chancery for further proceedings in accordance with this opinion.

## I. BACKGROUND

We take the facts, for the most part, from the Court of Chancery's recitation of them, which in turn, was drawn from the Complaint, documents incorporated by reference or integral to the Complaint, and additional materials provided by the parties in connection with Defendants' motion to dismiss.

### A. The Parties and Relevant Non-Parties

Appellant, Plaintiff-below, Germaninvestments Aktiengesellschaft (AG) ("Germaninvestments") is a Swiss holding company formed to manage assets for the Herrling family.[2] Its equity is divided among their family members as follows: Richard Herrling holds 34 percent; Anja Herrling holds 17 percent; Philip Herrling holds 24.5 percent; and Johannes Herrling holds 24.5 percent. Appellant, Plaintiff-below, Richard Herrling ("Herrling"), is a German citizen who resides in Switzerland. We refer to Germaninvestments and Herrling collectively as "Appellants" or "Plaintiffs."

Defendant-below, Allomet Corporation ("Allomet"), is a Delaware corporation

---

[2] *Germaninvestments AG v. Allomet Corp.*, 2019 WL 2236844, at *2 (Del. Ch. May 23, 2019) [hereinafter *Opinion*] (citing Verified Complaint ("Compl.") ¶ 4).

founded in 1998 with its headquarters in North Huntingdon Township, Pennsylvania. It manufactures high-performance, tough-coated metal powders using a proprietary technology for coating industrial products. Non-party, Fobio Enterprises, Ltd. ("Fobio"), a Hong Kong limited company, initially owned 52,249 of Allomet's 54,132 outstanding shares of common stock and all of its 1,304 shares of preferred stock. In April 2016, Fobio acquired the remaining 1,883 shares of Allomet's common stock, previously held by the Estate of Richard E. Toth.[3]

Defendant-below, Yanchep LLC ("Yanchep"), is a Delaware limited liability company with Mirta Hereth, the wife of Dr. Hannjörg Hereth ("Hereth"), as its sole member. Its only assets are the two parcels of real property in North Huntingdon where Allomet is headquartered and a lease, dated November 8, 2011, between Yanchep and Allomet.[4] Together, we refer to Allomet and Yanchep as "Appellees."

Non-party, AHMR GmbH ("AHMR"), an Austrian limited company, was formed solely for the purpose of holding all of the equity interest in Allomet and Yanchep, Allomet's intellectual property, and Yanchep's assets. Non-party, Hereth, a citizen of Switzerland, owns 100% of Fobio through various entities. Hereth is also a director and the Chairman of the Board of Directors of Allomet.

---

[3] *Id.* at *2 (citing Compl. ¶¶ 50, 52). The R&L Agreement states that the Toth shares were "acquired by [Dr. Hannjörg Hereth] or Fobio pursuant to a purchase contract dated 12 April 2016 —payment of USD 250,000 still outstanding[.]" App. to Opening Br. at A54 (Compl. Ex. B ("Ex. B") ¶ 4).

[4] *Opinion*, 2019 WL 2236844, at *2 (citing Compl. ¶¶ 7, 45, Compl. Ex. A ("Ex. A"), Compl. Ex. D ("Ex. D")).

B.      *The Parties Negotiate A Potential Joint Venture To Keep Allomet Afloat*

Allomet struggled with declining performance as early as 2002. By the end of 2017, Allomet had amassed net-operating-loss carryforwards of $25 million and $42.5 million in debt owed to its controller, Fobio.[5]

In mid-2016, Tanja Hausfelder, an insurance professional who apparently knew or worked with both Herrling and Hereth, advised Herrling that Hereth was looking for a joint venture partner to join Allomet. On October 5 and 6, 2016, Herrling and Hereth met in Switzerland, where Hereth confirmed he was interested in forming a joint venture for the purpose of raising capital for the struggling Allomet.

After their meeting in Switzerland, Herrling and Hereth discussed a general structure for their joint venture. Specifically, the plan contemplated the formation of an Austrian holding company that would own (i) Allomet's intellectual property rights, (ii) the outstanding stock and membership interests in Allomet and Yanchep, and (iii) all of Yanchep's buildings, land, and rights. Because Fobio had been the principal source of financing for Allomet since its founding,[6] the parties discussed whether it would be appropriate to assign or otherwise transfer Fobio's claims against Allomet to the joint venture.[7]

---

[5] *Id.* at *3 (citing Compl. ¶ 16).

[6] *Id.* (citing Compl. ¶ 29). Fobio had extended a total of $42,525,475.25 in loans to Allomet.

[7] *Id.* (citing Compl. ¶ 20, Ex. B ¶ 4). Appellants alleged that Herrling would obtain 50 percent ownership of the holding company, and that all existing indebtedness of Allomet to Fobio would be cancelled or contributed to the holding company. App. to Opening Br. at A22 (Compl. ¶ 20).

5

As the parties negotiated the joint venture, it was clear that Allomet required additional funding to continue its operations. Accordingly, beginning January 31, 2017, Herrling extended a series of loans to Allomet to keep it afloat. Herrling initially loaned $500,000. On March 3, 2017, Herrling loaned $150,000. On May 10, 2017, Herrling loaned another $200,000.

C.      *The Parties Enter the R&L Agreement*

On May 29, 2017, a draft of what was to become the R&L Agreement was circulated among the various parties.[8] The express purpose of the R&L Agreement was "to regulate the funding of the Allomet Corporation until the establishment, under Austrian law, of a holding company in which [Herrling] and [Hereth] shall acquire a 50% stake and which shall later hold all of the shares (100%) of the Allomet Corporation."[9] The R&L Agreement memorialized the terms of the loans Herrling had extended to Allomet, the potential framework for continued discussions concerning a potential Austrian-based joint venture, and the funding each party was expected to contribute to the joint venture.[10] It also detailed a loan schedule reflecting that Herrling would make loans to the entity in four tranches

---

[8] *Opinion*, 2019 WL 2236844, at *3 (citing Compl. ¶ 22, Ex. B).

[9] *Id.* (quoting Compl. ¶ 23).

[10] *Id.* (citing Ex. B Pmbl., ¶¶ 1, 4). The R&L Agreement's Preamble states:

> As the holding company has yet to be established, the initial payment shall be made by [Herrling], representatively, in the form of a loan to the Allomet Corporation. [Herrling] shall contribute a sum of EUR 10 million plus USD 250,000—Toth— over a period of 5 years. The payments shall be made in consultation with [Hereth], according to Allomet's liquidity requirements and based on an evaluation of the market need.

App. to Opening Br. at A54.

totaling $950,000. The loans would accrue interest at 5.5% interest per annum without pre-payment penalties or amortization.[11]

As noted above, the R&L Agreement states: "The agreement is subject to Austrian law. The place of jurisdiction is Vienna."[12] We refer to this provision as the "Forum Clause."

### D.    Formation of AHMR

The parties formed the Austrian holding company contemplated by the R&L Agreement, AHMR, on July 3, 2017. AHMR was registered with the commercial register of the commercial court in Vienna, Austria the following month. Its initial stockholders were Hereth, Herrling, Hausfelder, and Hereth's son-in-law, Valentin Biedermann. On December 14, 2017, Herrling allegedly transferred his share of AHMR to Germaninvestments, the holding company for his family's investment assets.[13]

AHMR is a "manager-managed" entity with two groups of managing directors: Group A consists of Biedermann, Hereth, and his wife, Mirta Hereth by proxy; Group B consists of

---

[11] *Opinion*, 2019 WL 2236844, at *3 (citing Ex. B ¶¶ 3, 5). The loans were extended "until" July 31, 2017, with a one-time option of a 6-month extension "agreed mutually between [Hereth] and [Herrling]." App. to Opening Br. at A54. During that time, "unless the parties decide[d] otherwise, an Austrian holding company [was] to be established in which the following assets of Allomet and Yanchep shall be incorporated:" (1) Allomet's outstanding stock; (2) all of Allomet's IP rights registered as of July 31, 2017; and (3) Yanchep's real property owned as of July 31, 2017. *Id.* at A54–A55. The R&L Agreement recognized that "[i]f the aforementioned steps have not been implemented by 31/07/2017, the loan shall become due for repayment immediately or the one-time extension may be agreed mutually between [Hereth] and [Herrling]." *Id.*

[12] *Opinion*, 2019 WL 2236844, at *4 (quoting Ex. B ¶ 9).

[13] *Id.* (citing Compl. ¶¶ 4, 33). AHMR's resulting stockholders are Hereth (49%), Germaninvestments (49%), Biedermann (1%) and Hausfelder (1%). App. to Opening Br. at A19, A25. Hausfelder allegedly assigned her litigation rights to Germaninvestments. *Id.* at A25–A26 (Compl. ¶ 34).

Herrling, Hausfelder by proxy, and Anja Herrling by proxy.[14]  Both groups' managing directors must agree on AHMR's major decisions as stated in AHMR's governance documents and as provided by Austrian law.[15]

### E.  Other Related Agreements

In their Opening Brief on appeal, Appellants focus on AHMR's "Stock Purchase Agreement with Fobio and a related assignment agreement under which it purchased 100% of the stock of Allomet."[16]  In their Complaint, they alleged that the parties entered into five separate agreements, all executed on the same day, to carry out the remaining terms of the R&L Agreement, namely:  (1) the Stock Purchase Agreement ("SPA"), (2) a Membership Interest Purchase Agreement ("MIPA"), (3) an Assignment and Assumption Agreement, (4) a Debt Cancellation Agreement, and (5) a Supplementary Agreement.[17]

Appellants alleged that, "[a]s agreed in the Restructuring Agreement, Fobio, AHMR, and Dr. Hereth entered into a Stock Purchase Agreement ("SPA") dated January 24, 2018, under which AHMR obtained all of the outstanding shares of Allomet from Fobio."[18]

---

[14] *Opinion*, 2019 WL 2236844, at *4 (citing Compl. ¶ 35).

[15] *Id.*  The Vice Chancellor commented that, "[a]lthough not important to the outcome here, I note that the Group A and Group B managing directors have not agreed that this litigation should be initiated on behalf of AHMR."  *Id.* at n.38 (citing Compl. ¶¶ 35, 82).

[16] Opening Br. at 9–10.

[17] App. to Opening Br. at A27–A28 (Compl. ¶ 39).

[18] *Id.* at A29 (Compl. ¶ 42).  They allege, more specifically, that:

> Under Section 3.2 of the Stock Purchase Agreement, and consistent with the terms of the Restructuring Agreement, "[a]t the closing of this transaction SELLER [Fobio] shall deliver or cause to be delivered to PURCHASER [AHMR] all certificates (if any) representing the Seller Shares and, if requested by

8

Appellants further allege that "Mrs. Hausfelder and Mr. Biedermann took possession of Allomet's outstanding stock certificates, though they still reflected the names of their previous owners, and placed them in AHMR's safe-deposit box in Vienna, Austria."[19] According to Appellants, "[s]ince that time no member of Dr. Hereth's Group A has been willing to agree with any member of Mr. Herrling's Group B to enable the shares to be released from the safe-deposit box and tendered to Allomet to enable it to issue certificates to AHMR."[20]

F.     Herrling "Walks" From the Negotiations

From May 2017 through January 2018, while the parties continued to negotiate their joint venture, Herrling visited Allomet numerous times and received detailed information on Allomet's operations and finances.[21]  He also extended additional loans to Allomet, either individually or through Germaninvestments, bringing Allomet's total obligation to Herrling to $3,665,000.[22]   While he "book[ed]" these loans under "the terms of the [R&L] Agreement,"[23] the R&L Agreement only references $950,000 in loans.[24]  It is alleged that the

---

PURCHASER [AHMR] at any time, execute and deliver lost stock affidavits for lost certificates."

Id. (quoting Compl. Ex. C).

[19] Id. at A27 (Compl. ¶ 38).

[20] Id.

[21] Opinion, 2019 WL 2236844, at *4 (citing Compl. ¶ 35).

[22] Id. (citing Compl. ¶ 36).

[23] Id. (quoting Compl. ¶ 37).

[24] Id. (citing Compl. ¶¶ 24, 26, Compl. Ex. G ("Ex. G")).

9

parties discussed, but never finalized, a loan agreement among Herrling and Allomet to address the loans outside the R&L Agreement.[25]

On January 29, 2018, the day before the R&L Agreement was to expire, AHMR's shareholders entered into the Supplementary Agreement, referred to above, the purpose of which was to allow time for the parties to secure additional tax advice regarding the structure of the joint venture.[26]

Under the Supplementary Agreement, the parties were to "regard the already signed [Transaction Agreements] as definitive" and agreed they would "then be Executed/Implemented as such."[27] The Supplementary Agreement provided, however, that the documents referenced therein are not legally binding and did not execute the joint venture. Specifically, the Supplementary Agreement stated the documents referenced had not yet "been legally signed," had not yet "become legally binding," and did not represent the "full legal implementation" of the joint venture.[28] It also deferred the parties' funding obligations

---

[25] *Id.*

[26] *Id.* (citing Ex. G).

[27] *Id.* (quoting Compl. ¶ 62).

[28] *Id.* (quoting Ex. G). Paragraph 4 of the Supplementary Agreement states:

> It is agreed between the Parties that [Herrling] or Germaninvestments AG shall not make further payments until all the contracts referred to here (see above), this Supplementary Agreement and also the Loan Agreement between Germaninvestments AG and the Allomet Corporation have been legally signed.

> This is also a prerequisite for Allomet's ongoing operating costs. The further payments, especially the two referred to below, shall be made within one month following full legal implementation or after all the contracts mentioned in this Agreement have become legally binding and been executed as well as after all the Allomet shares have been transferred to Vienna and once this "Supplementary Agreement" has fully expired.

App. to Opening Br. at A92 (Ex. G ¶ 4).

10

and recognized that the potential joint venture still had to be negotiated.[29] By its terms, the Supplementary Agreement expired in March 2018.[30]

By mid-April 2018, the parties had reached an impasse.[31] Herrling had not received the "transparency" he expected and believed "important business decisions were negotiated without [him]."[32] On May 30, 2018, the parties stopped all joint venture discussions.[33] With hope for an agreement now lost, Herrling offered to "walk away from the [R&L] Agreement with Dr. Hereth, provided, of course, that Allomet return all funds to Herrling and Germaninvestments, plus costs."[34] For his part, Hereth made clear that neither Herrling nor Germaninvestments possessed any interest in Allomet.[35] Hereth then offered to return only "a fraction" of the money Herrling had either loaned to (Hereth's view) or invested in (Herrling's view) Allomet.[36]

G.      The Proceedings in the Court of Chancery

Appellants filed their Verified Complaint on September 7, 2018, alleging three counts. Count I seeks to enforce the R&L Agreement and related agreements invoking 8 *Del. C.* § 168 to require Allomet to "reissue" its stock certificates in AHMR's name as

---

[29] *Opinion*, 2019 WL 2236844, at *4 (citing Ex. G ¶¶ 3, 4).

[30] *Id.* (citing Ex. G).

[31] *Id.* at *5 (citing Compl. ¶ 71, Compl. Ex. H).

[32] *Id.* (quoting Compl. ¶65).

[33] *Id.* (citing Compl. Ex. I).

[34] *Id.* (quoting Compl. ¶ 75).

[35] *Id.* (citing Compl. ¶ 76).

[36] *Id.*

11

contemplated by the R&L Agreement and SPA.[37]  Count II alleges breach of the R&L Agreement and related agreements and seeks specific performance of those agreements. Count III alleges unjust enrichment as a result of Appellees' failure to transfer all of Allomet's outstanding stock, Allomet's intellectual property, and Yanchep's membership units and real property to AHMR as agreed in the R&L Agreement.

Appellees moved to dismiss the action on December 16, 2018, primarily arguing that the court should grant the motion so that the parties may litigate these claims in Vienna, Austria.  Appellees provided scant information to the Court of Chancery on Austrian law in their opening brief in support of their motion to dismiss.  They cited to and attached Article 25 of the Brussels Regulation,[38] but cited no cases in support of their 12(b)(3) motion on the substance of Austrian law.[39]  Nor did they cite any secondary sources of information or proffer any expert testimony.

Appellants opposed the motion, arguing that the Forum Clause is neither mandatory nor enforceable with respect to their claim under Section 168.  They contended that the European law on which Appellees relied does not apply to non-European Union members, and that even if it did, it would not compel dismissal of their action.  They further argued

---

[37] App. to Opening Br. at A38–A40 (Compl. ¶¶ 80–85); *see id.* at A29 (Compl. ¶ 40) ("As agreed in the [R&L] Agreement, Fobio, AHMR, and Dr. Hereth entered into a Stock Purchase Agreement ('SPA'), dated January 24, 2018, under which AHMR obtained all of the outstanding shares of Allomet from Fobio.").

[38] *Id.* at A139 (Defs.' Opening Br. at 18–19), A159 (Defs.' Opening Br. Ex. 1).

[39] *See id.* at A141–A142.  Appellees did cite in a footnote several cases in support of its argument that the Complaint failed to state a claim under Rule 12(b)(6).  *See id.* at A141 n.7.

that, under Austrian law, an Austrian court would not find that the Forum Clause would confer mandatory jurisdiction on Vienna courts.

In their answering brief, Appellants objected to the application of foreign law and argued that the Forum Clause should be interpreted in accordance with Delaware law. They contended that Appellees had provided only conclusory statements on Austrian law and, consequently, had failed to meet their burden of proof. As a result of that failure, they argued that the Forum Clause was permissive under either Delaware or Austrian law. Moreover, Appellants argued that the Brussels Regulation only applied to Member States of the European Union, and that AHMR, who was not a signatory to the R&L Agreement, was not bound by it. Thus, they argued that the Forum Clause does not apply to the Section 168 claim (which was brought on behalf of AHMR) or to the unjust enrichment claim.

Appellants raised other arguments based on several other provisions of the Brussels Regulation, including Articles 8, 24, 26, 27, 31, and several of its "Whereas" recitals. For example, they argued that the objective of Article 24 "is to ensure that proceedings regarding the internal affairs of a corporate entity should be dealt with by the courts of the state where that entity is incorporated, since these courts will be familiar with the applicable corporate law."[40] They also asserted that, "Article 8 of the Brussels Regulation provides that defendants can be sued where they are domiciled and a Delaware corporation, like Allomet,

---

[40] *Id.* Brussels Regulation Article 27 provides that, "[w]here a court of a Member State is seized of a claim which is principally concerned with a matter over which the courts of another Member State have exclusive jurisdiction by virtue of Article 24, it shall declare of its own motion that it has no jurisdiction." *Id.* at A170.

13

is domiciled in Delaware."[41] Appellants supported their arguments with citations to Austrian cases and provided translations of certain excerpts of those cases.[42] As to Article 25, Appellants argued that by its plain terms, it does not apply if the parties "have agreed otherwise." They further cited Section 914 of the Austrian Civil Code for the proposition that the mutual intent of the parties controls.

In their reply brief, Appellees argued that Article 25 of the Brussels Regulation is clear and unambiguous. They supplied a transmittal affidavit of their Delaware counsel attaching various secondary sources, consisting mostly of articles.[43] Appellees then challenged Appellants' assertion that Austrian law, and not the Brussels Regulation, applied. They asserted that Article 25 of the Brussels Regulation was "exclusive," that Austria had supplanted its local law through ratification of the Brussels Regulation, and that Appellants were relying on superseded authorities. They also responded to Appellants' assertions based upon Articles 8 and 24 of the Brussels Regulation, among others. As to Article 24, Appellees countered that, "this action does not implicate an internal affairs question, nor could it until

---

[41] *Id.* at A349.

[42] *Id.* at A341. Appellants also rely on Whereas Clause 6 and 13. *Id.* at A345. Clause 6 provides: "In order to attain the objective of free circulation of judgments in civil and commercial matters, it is necessary and appropriate that the rules governing jurisdiction and the recognition and enforcement of judgments be governed by a legal instrument of the Union which is binding and directly applicable." *Id.* at A161 (Brussels Reg.). Clause 13 provides: "There must be a connection between proceedings to which this Regulation applies and the territory of the Member States. Accordingly, common rules of jurisdiction should, in principle, apply when the defendant is domiciled in a Member State." *Id.* at A162. Appellees counter that these clauses are merely recitals, and lack the force of Articles.

[43] *See id.* at A512–A515 (Coleen W. Hill Aff. in Supp. of Defs.' Reply Br. in Further Supp. of their Mot. to Dismiss), A516–A682 (Exs. A–L.).

the dispute concerning the R&L Agreement is resolved."[44]  Article 8, they asserted, applies to a "person domiciled in a member state," which neither Allomet nor Yanchep are.  Broadly, Appellees claimed that Articles 8, 24, 26, and 31 all apply to member states, and that Delaware is not a member state.  They said that, therefore, those provisions of the Brussels Regulation are not relevant.

Further, Appellees countered that the question of enforcement is not whether Delaware is bound by the Brussels Regulation, but rather, whether the court should honor the parties' contractual choices.  They argued that it should, since enforcement of the Forum Clause is a matter of contract, not comity.[45]  As to Section 914 of the Austrian Civil Code, they argued that it only addresses the interpretation of agreements in cases where the wording of the agreement is wrong by reason of mistake and does not reflect the intention of the parties.  Thus, they argued that it is not implicated here.  We note that one of the authors Appellees cited for the proposition that the Brussels Regulation applies later submitted an affidavit for the Appellants contradicting that assertion, arguing instead that the Austrian Jurisdictional Act applies.

During the oral argument on Appellees' motion to dismiss, the Vice Chancellor expressed some obvious discomfort with the state of the record on the foreign law issues.  For example, the Court commented as follows:

> THE COURT:  All right.  So a couple things, just to give you by way of some seventh-inning analysis.

---

[44] *Id.* at A485.

[45] *See Nat'l Indus. Grp. (Hldg.) v. Carlyle Inv. Mgmt. L.L.C.*, 67 A.3d 373, 387 (Del. 2013) ("The enforcement of an international forum selection clause is not an issue of comity.  It is a matter of contract enforcement and giving effect to substantive rights that the parties have agreed upon.").

I'm going to take the matter under advisement, but I do want to give you some advance warning that it is possible that - - I'm not saying likely - - it's possible we've got to wrestle through several issues that would get us to a point where we would go down this road. *But it is possible that you would hear from me saying I need more information on Austrian law/EU law as relates to the Brussels treaty, whatever we're calling it, various articles and how they relate to one another.*

I think to get there, we would have to decide several issues in a particular way. I think we would have to decide that the forum selection provision should be interpreted under Austrian law as opposed to Delaware law. If it was to be interpreted under Delaware law, as I understand it, the outcome would be that it's not mandatory and, therefore, not strictly enforceable to require litigation of the dispute in Vienna.

We'd also have to decide that Section 115 of the DGCL would not nullify the provision as a matter of law.

We'd also, I suppose, have to decide in that regard potentially that the claim in Count I under 168 is premature in that there are contract disputes that first have to be litigated and resolved.

*And finally, we would have to grapple with the question of what the presence of the unjust enrichment claim here does to the analysis on choice of forum, understanding that there's an argument that it doesn't state a claim as a matter of law. But assuming it does, does its presence in the complaint somehow nullify the choice of forum with respect to the contract claim, understanding that if the Court enforced that provision, there would be a split of claims and litigation?*

So those are several issues that we've got to wrestle with before we get there.

*The last thing we'd have to wrestle with is, looking at the materials that have been supplied, is the law of Austria clear, in my mind, one way or the other, or are there questions or nuances? If I decide that there are, then there are two approaches that can be taken under Rule 44.1 and Rule 202(e), I think, of the Delaware Rules of Evidence. One is that the Court employs its own expert, with input from the parties, having given notice to the parties of that. And there's a process, obviously, that flows from that that comports with due process and gives the parties an opportunity to weigh in not only on the selection of the expert but then to challenge the conclusions of that expert.*

*Often that is done by the parties engaging their own experts. And that, at least, suggests to me some potential inefficiency in that approach.*

*The other is that the parties, in fact, do just that, engage their own experts. We decide how those opinions should be supplied to the Court, tested by the parties, and then the Court draws from that additional evidence its conclusions regarding the state of Austrian law and how it should apply to these circumstances. Also not a model of efficiency, but it is, I think, recognized in our law as at times necessary to assist the Court in wrestling with foreign law and having ultimately a declaration of what that law is, just as we would declare what our law is prior to applying it, in this case to the dispositive motions.*

*On the one hand, the* Saudi *case that I mentioned before, affirmed by the Supreme Court, I think, reflects - - or is illustrative of the approach where the Court engages its own expert. And I think there was another case, the* Pallano *case, I believe also presided over by President Judge Jurden - - I was involved in that case as a Master - - and I recall it having involved some foreign law issues there. That was on one hand. And then the other is the* Parlin *case where the Court just said "Look, these are nuanced questions. I have some reservation based on the written materials that have been submitted about making a formal declaration that this is, in fact, what the law is," and asked to hear more directly from experts on foreign law, and then made credibility determinations and ultimately made a decision.*

*Again, I'm not sure that I'm there, but I wanted to preview, if I get there, why I'm there so that I don't have to undertake that explanation again; you know, that if you hear from me in that regard, that's what I've decided, that I need that additional information. And then we can either, through a meet and confer that you-all have or I would be happy to participate in that, decide what the next steps are.*[46]

Without soliciting any further information from the parties, the Court of Chancery dismissed all counts of the Complaint for lack of jurisdiction based upon its reading of the Brussels Regulation. It ruled that the Forum Clause was governed by Article 25, and therefore jurisdiction vested in a member state "shall be exclusive unless the parties have

---

[46] App. to Opening Br. at A773–A777 (emphasis added).

17

agreed otherwise."[47] Accordingly, it held that, "when parties designate a single 'jurisdiction' as the 'place' where they will resolve their disputes, that contractual designation will be enforced as a mandatory forum selection clause."[48] Thus, the court concluded that the Forum Clause was mandatory, not permissive. This is in contrast to Delaware law where "if the forum selection provision does not state that it is exclusive in crystalline terms, our courts will construe the provision as permissive."[49]

In a footnote, the Court of Chancery observed that, "[w]hile the Court could convene a hearing to take testimony regarding the parties' competing views of the governing foreign law, there is no need to put the parties or the Court through that added burden because the law is, in my view, clear."[50] The Vice Chancellor added that, "[a]lthough I am satisfied that the law is clear, as might be gleaned from the analysis that follows, the process by which I have reached this conclusion was by no means 'simple.'"[51]

After the motion to dismiss was granted, the Appellants moved for reargument and submitted an affidavit of an Austrian law expert, Professor Dietmar Czernich.[52] This was the only expert submission in the case on the subject of foreign law. The Czernich affidavit reaches two main conclusions:

---

[47] *Opinion*, 2019 WL 2236844, at *8 (quoting Brussels Reg. Art. 25(1)) (internal quotation marks omitted).

[48] *Id.*

[49] *Id*.

[50] *Id.* at *6 n.73.

[51] *Id*.

[52] *See* App. to Opening Br. at A796–A812 (Aff. of Prof. Dietmar Czernich, LLM (NYU)).

(1) With regard to prayers for relief A., B. and C. (ii) in the first part, relating to corporate matters and claims *in rem*, the choice of forum agreement in clause 9 of the R&L Agreement is invalid because under the Brussels Regulation and Austrian domestic law choice of forum agreements in corporate matters or in *in rem* actions are not admissible and invalid.

(2) For all other prayers for relief, the choice of forum agreement is valid. It is subject to Austrian law. Under Austrian domestic law, this choice of forum agreement is permissive and does not mandate the exclusive jurisdiction of the designated courts in Vienna (Austria). Under applicable Austrian law, actions under the R&L Agreement may also be brought before any other court of competent jurisdiction.[53]

Appellants, through Professor Czernich, argued further that under Articles 4 through 6 of the Brussels Regulation, the Brussels Regulation applies (a) if the defendant is domiciled in a Member State of the European Union, (b) if there is a choice of forum agreement in favor of a court which has its seat in a member state of the European Union and the action is brought before any court which has its seat in the European Union, or (c) if there is a certain contract which mandates exclusive jurisdiction under Article 24. Aside from other possible minimal grounds that he deemed irrelevant, he concluded that the Brussels Regulation does not apply here. If the Brussels Regulation does not apply, he asserted, the jurisdiction of the courts in Austria is governed by domestic national law—the Austrian Jurisdictional Act. He relied on Article 6 of the Brussels Regulation in support of this proposition: "If the defendant is not domiciled in a Member State, the jurisdiction of the courts of each Member State shall, subject to Article 18(1), Article 21(2) and Articles 24 and 25, be determined by the law of that Member State."[54]

---

[53] *Id.* at A812.

[54] Brussels Reg. Art. 6.

Appellants further contended that the plain language of Article 25 makes clear that jurisdiction shall be exclusive "unless the parties have agreed otherwise,"[55] which the Court of Chancery did not determine.[56] They further argued, via the affidavit, that Austrian law should govern resolution of that question and that regardless of which law applies, the Delaware choice of law provisions in the other agreements evidence an intent to "agree otherwise." Czernich averred that the issue is not whether the Brussels Regulation overrides Austrian domestic law, but rather, what the parties meant—did they mean the Brussels Regulation or domestic Austrian law?

---

[55] Appellants also asserted that "the parties didn't intend to have that exclusively governed in Vienna," as evidenced by other agreements containing Delaware law and forum provisions, and thus Article 25 cannot be binding on them because they have "agreed otherwise" as to exclusive jurisdiction in Vienna. App. to Opening Br. at A736. Section 8.2(a) of the SPA requires the parties to mediate disputes "between the parties as to the interpretation or application of this Agreement," and that the mediation "shall be held in Wilmington, Delaware or any other venue upon which the parties shall agree." *Id.* at A62. Section 8.2(b) of the SPA requires any arbitration between the parties to be conducted pursuant to the Delaware Rapid Arbitration Act and that the arbitration "shall be conducted in Wilmington, Delaware or such other location as the parties and the arbitrator may agree . . . ." *Id.* at A62–A63. The MIPA contains parallel provisions. *See id.* at A72. Both agreements select Delaware as the governing law without giving effect to choice of law or conflicting provisions or rules that would cause the laws of another jurisdiction to be applied. The Assignment and Assumption Agreement also contains a similar Delaware choice of law provision.

[56] In their motion for reargument, Appellants asserted that the Court of Chancery erred in ignoring the arbitration clause in the SPA. In its order denying the motion for reargument, the court commented that, "Plaintiffs apparent rediscovery of the SPA's arbitration clause (not invoked before now) is puzzling given that one of their showcase arguments in opposition to the motion to dismiss was that the Court should sidestep the SPA by applying 8 *Del. C.* § 168." *Germaninvestments AG v. Allomet Corp.*, 2019 WL 2644045, at *6 n.14 (Del. Ch. June 27, 2019) [hereinafter *Order*]. Although in their answering brief below the Appellants argued that, "[t]he relevant stock purchase agreements for the purchase of Delaware equity and membership units are governed by Delaware law," App. to Opening Br. at A337, they do not refer expressly to that agreement's Rapid Arbitration provision to rebut an assertion by Appellees that Fobio was a necessary party, except in a footnote. *Id.* at A358 (Pls. Ans. Br. at 58 n.21). They did refer to the Delaware Rapid Arbitration provision during oral argument below. *See id.* at A723. We agree with the Vice Chancellor that the SPA was not a focus in those proceedings and Appellants' theories have seemed to evolve over time.

20

In response to Appellants' motion for reargument, Appellees offered several points in rebuttal to the affidavit, including challenging Professor Czernich's reliance on Article 24 of the Brussels Regulation. They asserted that the affidavit is based upon the erroneous premise that this dispute concerns the internal affairs of Allomet and is an action *in rem* with respect the Yanchep's real property in Pennsylvania. They say neither is accurate.

The Court of Chancery denied the motion and refused to consider the affidavit, stating that it was "new evidence" and should have been submitted earlier.

### H. Issues on Appeal

Appellants raise two main issues on appeal, as well as a host of sub-issues. First, they contend that the Court of Chancery erred when it determined that it could not adjudicate ownership of a Delaware corporation under 8 *Del. C.* § 168. They assert that the Court of Chancery's decision in *Castro v. ITT Corp.*[57] provides compelling support for the proposition that Section 168 of the DGCL is a proper basis for the relief they seek. As part of this argument, they contend that the court erred when it rejected their argument that the public policy underlying 8 *Del. C.* § 115 prohibits a corporation from eliminating Delaware as a forum to hear internal governance claims. That, of course, raises the question of whether this case presents internal governance claims, or as the Vice Chancellor found, a contractual dispute.

Second, they contend that, even if the Forum Clause were enforceable in this action, it is permissive, not mandatory. They argue that the Appellees failed to meet their burden of

---

[57] 598 A.2d 674 (Del. Ch. 1991).

establishing the substance of Austrian law, and that by granting the motion to dismiss without the parties properly joining the issues, the Court improperly placed the burden on Appellants and departed from the established practice in Delaware for ascertaining the substance of foreign law. They also contend that the Court of Chancery erred in refusing to consider their affidavit on foreign law submitted in connection with their motion for reargument.

## II. STANDARD OF REVIEW

We review *de novo* the Court of Chancery's ruling on the questions of Austrian and European law.[58] Our review of the Court of Chancery's interpretation of contractual terms is *de novo*.[59] Our interpretation of a statute is a question of law, which we review *de novo*.[60]

## III. ANALYSIS

We begin by considering the foreign law issues. Appellants broadly contend that the court erred in its initial determination that Austrian law should apply in analyzing the Forum Clause, and they raise four sub-issues. First, they contend that questions of ownership of a Delaware entity should be decided under Delaware law and that Austria has no material relationship to the transactions at issue. Second, they assert that foreign law cannot be used to interpret a contract in a manner repugnant to Delaware policy. In this regard, they say that

---

[58] *Deuley v. DynCorp Int'l, Inc.* 8 A.3d 1156, 1160 (Del. 2010) ("A judge's ruling on foreign law is a question of law we review *de novo*."); *see Saudi Basic Indus. v. Mobil Yanbu Petrochemical Co.*, 866 A.2d 1, 30 (Del. 2005) (stating that, "[t]o the extent SABIC contends that the Superior Court made incorrect determinations of Saudi law or instructed the jury incorrectly on issues governed by Saudi law, such determinations and jury instructions are treated as rulings on a question of law and are subject to *de novo* review," and that where "the trial court's determination of foreign law rests on the credibility of foreign law experts, the trial court's predicate credibility findings will be accorded appropriate deference").

[59] *BLGH Hldgs. LLC v. enXco LFG Hldg. LLC*, 41 A.3d 410, 414 (Del. 2012).

[60] *First Health Settlement Class v. Chartis Specialty Ins. Co.*, 111 A.3d 993, 998 (Del. 2015).

22

the court failed to consider the Delaware law provisions in the SPA and MIPA.  Third, they argue that, if this Court agrees with the Vice Chancellor that Austria does bear a material relationship to the transactions, then we should first consider their argument that the court erred in determining that Appellees had satisfied their burden of proof.  Finally, they argue that, if we find no error as to the burden of proof, then we should determine whether the court erred in its interpretation of Austrian law.

As more fully explained below, we affirm the Vice Chancellor's decision to apply Austrian law in its analysis of the Forum Clause because Austrian law bears a material relationship to the transactions at issue.  But the court erred in determining that Appellees satisfied their burden of proof in establishing foreign law.  As a result of Appellees' failure to carry their burden, we hold that the Court of Chancery should apply the law of the forum (Delaware law) in analyzing the Forum Clause.[61]  Applying Delaware law to the Forum Clause, the provision is clearly permissive, not mandatory.  Accordingly, we hold that the Forum Clause is no bar to the matter proceeding in Delaware.

A.     *The Court of Chancery Incorrectly Determined That Appellees Met Their Burden of Establishing Austrian Law*

1.  *Which Law Governs the Forum Clause Analysis?*

As a threshold matter, we must determine what law governs the analysis of the Forum Clause.  We agree with the Court of Chancery that Austrian law applies here.

---

[61] Accordingly, we do not consider the other claims of error as to whether Delaware public policy is violated by having this matter proceed in Austria.

23

"When a contract contains a forum selection clause, this court will interpret the forum selection clause in accordance with the law chosen to govern the contract."[62] Choice of law provisions control so long as the jurisdiction selected bears some material relationship to the transaction.[63] This Court has stated that a material relationship exists where a party's principal place of business is located within a foreign jurisdiction, a majority of the activity underlying the action occurred within the foreign jurisdiction, and where parties to a contract performed most of their services in the foreign state.[64] However, a foreign jurisdiction's laws may not be used to interpret a contractual provision "in a manner repugnant to the public policy of Delaware."[65]

The facts alleged here involve connections to several jurisdictions. Allomet is a Delaware corporation with headquarters in Pennsylvania. Yanchep is a Delaware LLC with assets in Pennsylvania. The stock at issue is located in Delaware by operation of 8 *Del. C.* § 169. Germaninvestments is a Swiss company, with headquarters in Switzerland. Herrling is domiciled in Switzerland. Hereth is a citizen of Switzerland. Fobio is a Hong Kong limited company. The parties executed the R&L Agreement in Switzerland, and

---

[62] *Bonanno v. VTB Hldgs., Inc.*, 2016 WL 614412, at *5 (Del. Ch. Feb. 8, 2016) (quoting *Ashall Homes Ltd. v. ROK Entm't Grp., Inc.*, 992 A.2d 1239, 1245 (Del. Ch. 2010)) (internal quotation marks omitted).

[63] *Deuley*, 8 A.3d at 1161; *Annan v. Wilmington Trust Co.*, 559 A.2d 1289, 1293 (Del. 1989); *see also Ingres Corp. v. CA, Inc.*, 8 A.3d 1143, 1146 (Del. 2010) ("Forum selection [ ] clauses are 'presumptively valid' and should be 'specifically' enforced unless the resisting party '[ ] clearly show[s] that enforcement would be unreasonable and unjust, or that the clause [is] invalid for such reasons as fraud and overreaching.'" (citation omitted)).

[64] *Deuley*, 8 A.3d at 1161.

[65] *Id.* (quoting *J.S. Alberici Const. Co. v. Mid-West Conveyor Co.*, 750 A.2d 518, 520 (Del. 2000)) (internal quotation marks omitted).

Plaintiffs allege that all negotiations occurred in Switzerland, other parts of Europe, or Pennsylvania. The R&L Agreement, a focal point of Plaintiffs' Complaint, contains the Forum Clause and selects Austrian law as the governing law. The SPA and MIPA, which relate to the purchase of Delaware equity, are governed by Delaware law. Non-party AHMR was formed in Austria. The safe-deposit box containing the Delaware certificates is physically located in Austria.

The Court of Chancery ruled that, "[t]here can be no doubt . . . that Austria 'bears [a] material relationship to the transaction.'"[66] It reasoned that Austrian law applied to the R&L Agreement that contemplated the formation of an Austrian joint venture. The court further determined that "this action is undeniably about Plaintiffs' claims to enforce the Austrian law-governed R&L Agreement."[67] Moreover, the court observed that each count for relief relates directly to the R&L Agreement. Thus, the court held that, "Austrian law will govern the construction of Section 9 of the R&L Agreement."[68] As explained below, given our holding that Section 168 does not apply, the focus of the Complaint is on the R&L Agreement in Count II (as opposed to the SPA), as well as on the unjust enrichment claim.[69] Therefore,

---

[66] *Opinion*, 2019 WL 2236844, at *6 (citing *J.S. Alberici Const. Co.*, 750 A.2d at 520).

[67] *Id.*

[68] *Id.*

[69] Appellants also argued that because Delaware and Austrian law would both deem the Forum Clause to be permissive, and not mandatory, there was a "false conflict" and that a choice of law analysis is unnecessary. *See, e.g., Deuley*, 8 A.3d at 1161 (citing *Berg Chilling Sys., Inc. v. Hull Corp.*, 435 F.3d 455, 462 (3d Cir. 2006) ("According to conflicts of law principles, where the laws of two jurisdictions would produce the same result on the particular issue presented, there is a 'false conflict,' and the Court should avoid the choice-of-law-question.")). But here, the threshold question is whether under Austrian law, the Forum Clause is governed by the Brussels Regulation, which all parties agree reverses the presumption that forum clauses are not mandatory unless they are in "crystalline" terms. In other words, it is not disputed that Austrian domestic and Delaware law would

we agree with the Court of Chancery's determination that the connection to Austria is sufficiently material so as to require the analysis of the Forum Clause to be examined under Austrian law.[70]

### 2. *Appellees Failed to Meet Their Burden of Establishing the Substance of the Foreign Law at Issue*

We next address Appellants' contention that the Appellees failed to meet their burden of establishing the substance of the foreign law, and that the Court of Chancery, in effect, improperly shifted the burden of proof to them and allowed Appellees to hold back all of their proof until their reply brief. Appellants also complain that the Court of Chancery did not consider their expert affidavit, the only expert affidavit submitted in this action (which was submitted in connection with their motion for reargument).

Court of Chancery Rule 44.1 makes clear that Appellees were required to provide notice in their pleadings or other reasonable written notice of their intention to rely upon

---

both deem the Forum Clause permissive. But the question is whether Article 25 trumps Austrian domestic law (as Appellees contend), or whether the parties intended for Austrian domestic law (not the Brussels Regulation) to control (as Appellants contend). Here the foreign law dispute centers on the interplay between the Brussels Regulation and European law on the one hand, and domestic Austrian law on the other. Our holding that Appellees failed to carry their burden of establishing the foreign law on these issues leads us inevitably back to Delaware in any event.

[70] On appeal, Appellants have, undoubtedly, sharpened their focus and emphasis on the SPA and its Delaware forum and choice of law provision. They assert that the Vice Chancellor erred in holding that Appellants had waived their arguments based on these provisions in the SPA. *See Order*, 2016 WL 2644045, at *6 n.14. Appellants did refer to the SPA in their Complaint, *see*, *e.g.*, App. to Opening Br. at A38–A39 (Compl. ¶¶ 80, 82, 83), and in the proceedings below. *See*, *e.g.*, App. to Opening Br. at A337, A723, A727, A730, A736. But their arguments regarding the SPA were not squarely presented in their briefing. *See id.* at A735–A736. In any event, we have reviewed all of the relevant agreements, and our decision affirming the determination that the connections to Austria were sufficiently material is not dependent upon the Vice Chancellor's finding of waiver.

foreign law.[71]  Compliance with proper notice under Rule 44.1 is not at issue here.  What is contested is whether Appellees met their burden.  To the extent our prior cases have not explicitly held, we hold that the party seeking the application of foreign law has the burden not only of raising the issue of the applicability of foreign law, but also, of establishing the substance of the foreign law to be applied.[72]  Appellants contend that the Court of Chancery effectively put the burden on them to rebut Appellees' assertion and thereby departed from the "established practice" for establishing the substance of foreign law.  That assertion raises the question of whether there is an "established practice" and if so, what it is.

We sympathize with the trial judge as there are very few decisions from this Court that can serve as a reference in this area.  Generally, the process by which foreign law is determined is necessarily context-specific, and trial judges have wide latitude in determining

---

[71] Court of Chancery Rule 44.1 provides:

> A party who intends to raise an issue concerning the law of a foreign country shall give notice in his pleadings or other reasonable written notice.  The Court, in determining foreign law, may consider any relevant material or source, including testimony, whether or not submitted by a party or admissible under Rule 43.  The Court's determination shall be treated as a ruling on a question of law.

[72] This holding is consistent with decisions of the Court of Chancery and the Superior Court.  *See, e.g.*, *Vichi v. Koninklijke Philips Elecs., N.V.*, 85 A.3d 725, 765 (Del. Ch. 2014) ("In cases where foreign law may be applicable, the party seeking the application of foreign law has the burden of not only raising the issue that foreign law applies, but also the burden of adequately proving the substance of foreign law." (citation and internal quotation marks omitted)); *see also Rep. of Pan. v. Am. Tobacco Co.*, 2006 WL 1933740, at *4 (Del. Super. June 23, 2006), *aff'd sub nom. State of São Paulo of Federative Rep. of Braz. v. Am. Tobacco Co.*, 919 A.2d 1116 (Del. 2007) ("In order for the Court to consider the application of foreign law, the party seeking the application of foreign law has the burden of not only raising the issue that foreign law applies, but also the burden of adequately proving the substance of foreign law."); 9 JAMES WM. MOORE ET AL., MOORE'S FEDERAL PRACTICE § 44.1.04[1] (3d ed. 2006) ("The party that wishes to rely on foreign law has the responsibility of demonstrating its content."); Jeffrey F. Ghent, Annotation, *Pleading and Proof of Law of Foreign Country*, 75 A.L.R.3d 177, § I.2[a] (1977) ("the courts appear to be in agreement on the general rule that the burden of proving the law of a foreign country is on the party relying on it").

27

what evidence to consider and in what form. Even so, that latitude is not unbounded. We highlight a few decisions to discern some general guideposts.

*Saudi Basic Indus. Corp. v. Mobil Yanbu Petrochemical Co.*,[73] a case mentioned by the Vice Chancellor, is one such case where this Court approved the process by which the trial judge ascertained the substance of the foreign law at issue. There, this Court considered whether the Superior Court had engaged in a proper methodology and analytical process to determine Saudi Arabian law. Appellant, Saudi Basic Industries Corporation ("SABIC") argued that the trial court, although purporting to employ the methodology that a Saudi judge would follow to determine the applicable Saudi law, *ijtihad*, in fact invoked *ijtihad* merely as an after-the-fact rationalization for foreign law rulings that were essentially arbitrary and unprincipled.[74]

This Court rejected those contentions because the record clearly established that the trial judge "went to extraordinary lengths to understand the applicable Saudi law and to make rulings that were consistent with the numerous Saudi law sources presented to her."[75] We found that the trial judge was keenly mindful of key distinctive features of Saudi law and the problems that it created for defining the elements of, and remedies for, *ghasb* (usurpation) and how to instruct the jury on these issues. As an example of such distinctive features, Islamic law does not embrace the common law system of binding precedent and *stare decisis*. In Saudi Arabia, judicial decisions are not in themselves a source of law, and with minor

---

[73] 866 A.2d 1 (Del. 2005).

[74] *Id.* at 29. The parties agreed that Saudi law applied to the resolution of the dispute.

[75] *Id.* at 30.

exceptions, court decisions in Saudi Arabia are not published or even open to public inspection. Instead of relying upon statutes or decisional precedent to discern the applicable law, Saudi judges use scholarly treatises as guides to identify a spectrum of possibilities on a given question, as opposed to a single correct answer. Thus, the critical inquiry was whether the proper analytical procedures (or *ijtihad*) were followed in reaching the results.

We found that the trial judge properly recognized the proper analytical procedures in reaching the result. [76] The trial judge made "exceptional efforts to ensure that she was fully informed of the Hanbali teachings upon which to ground her legal rulings."[77] Before trial, the parties presented the trial judge with seven reports from four Saudi law experts (two from each side), as well as each expert's lengthy deposition. Perceiving a conflict in the experts' opinions, the trial judge retained an independent expert and obtained his advice on the critical issues. This expert prepared an initial report, a supplemental report, and was deposed for a full day. After reviewing nine reports and over one thousand pages of deposition testimony, the trial judge held a day-long pre-trial hearing to permit the parties to present live testimony of the independent expert, among others. The court considered two additional reports post-trial. On that record, this Court concluded that there was no basis for SABIC to contend that the trial court's analytical process was arbitrary, unprincipled, or lawless.

---

[76] For example, the trial judge stated that "[w]hen faced with the daunting task of determining the elements of *ghasb* and the damages available for this tort, the Court, weighing the credibility of each Saudi law expert, exercised, as best it could under the circumstances, *ijtihad*, to reach the 'right' result." *Id.* at 31.

[77] *Id.* at 31. The Hanbali is an Islamic law guild or school of thought. "In Saudi Arabia, the judges are instructed to rule exclusively in accordance with the teaching of the Hanbali guild." *Id.* at 30.

29

The Superior Court's decision in *Republic of Panama v. American Tobacco Co.*[78] is also instructive. It illustrates a situation where the burden of proof was not satisfied. In *Republic of Panama*, two foreign governments, the Republic of Panama and the State of São Paulo, Brazil (the "Foreign Governments"), brought an action against a domestic tobacco company to recover medical expenses incurred while treating foreign citizens for health issues associated with tobacco products.[79] Among other claims, the Foreign Governments specifically sought recovery for negligence, breach of voluntary undertaking, unjust enrichment, fraud, and civil conspiracy under Delaware law. The company filed a motion to dismiss for failure to state a claim upon which relief can be granted. The court held that Delaware law would apply because the Foreign Governments did not meet their burden of establishing the substantive applicable law of Panama and Brazil.

The Superior Court stated that the party seeking the application "has the burden of not only raising the issue that foreign law applies, but also the burden of adequately proving the substance of the foreign law."[80] Though the Foreign Governments provided affidavits on Panamanian and Brazilian law, the court concluded that they were insufficient because the affiants did not have any formal legal training. Specifically, the court found that:

> [b]oth affiants head their respective governments' health agencies and, of course, it is inevitable that in that capacity they will gain some understanding of their countries' laws. Their governments are each a party to this action, and their governments are seeking to recover the medical expenses incurred by the very same agencies the affiants head. However, neither of these two

[78] 2006 WL 1933740 (Del. Super. June 23, 2006).

[79] *Id.* at *1.

[80] *Id.* at *4.

affiants have proffered that they have an expertise in law of their jurisdictions. The affiants are not attorneys, law professors, or judges.[81]

Even acknowledging that courts have "wide latitude" in determining what evidence to consider and in what form, it stated that given the far-reaching relief sought by the Foreign Governments, they should have at least submitted affidavits from legal experts. Accordingly, it held that "Delaware law will control all claims made by the Foreign Governments."[82]

Delaware courts have frequently relied on experts to ascertain the substance of foreign law. In *Pallano v. AES Corp.*, for example, the Delaware Superior Court, before rendering its decision on a motion to dismiss, hired its own Dominican law expert.[83] The court relied upon the expert in deciding that motion, commenting that, "[t]he court felt it necessary to appoint its own Dominican law expert when it became apparent that the plaintiffs' and defendants' experts disagreed on the proper interpretation of Dominican law."[84] In *Parlin v. Dyncorp Int'l, Inc.*,[85] the Superior Court considered expert declarations concerning United Arab Emirates and Dubai law but held that the decision did not turn on foreign law because the result was the same under both Delaware and Dubai law.[86] Finally, in *Kostolany v. Davis*,[87] the parties submitted expert affidavits on Dutch and French law.[88] The Court of

---

[81] *Id.* at *5.

[82] *Id.*

[83] 2012 WL 1664228, at *1 n.2 (Del. Super. May 11, 2012).

[84] *Id; see Deuley*, 8 A.3d at 1161.

[85] 2009 WL 3636756 (Del. Super. Sept. 30, 2009).

[86] *Id.* at *2.

[87] 1995 WL 662683 (Del. Ch. Nov. 7, 1995).

[88] *Id.* at *2–3.

Chancery deemed the affidavits sufficient and found no need for expert depositions or live expert testimony.

The procedural rules followed by our trial courts reflect their considerable latitude in determining what evidence to consider in determining issues of foreign law. For example, the text of Court of Chancery Rule 44.1 provides, in relevant part, that, "[t]he Court, in determining foreign law, may consider any relevant material or source, including testimony, whether or not submitted by a party or admissible under Rule 43."[89] "Typically, the movant will submit enough 'relevant material' to the Court to sufficiently establish the content of foreign law."[90] But that did not happen here. Appellees, as movants, supplied only the text of Article 25 of the Brussels Regulation. They cited no cases, commentaries, or other authorities, and proffered no expert testimony. They offered academic support in the form of secondary sources, but only in their reply papers after Appellants had responded to their motion. Thus, Appellants had no real or meaningful opportunity to respond to these authorities prior to the court's ruling.

Although the trial court states in its Opinion that, "the parties have provided extensive foreign authority and affidavits interpreting that authority,"[91] the only affidavit we see that was considered by the Court was the transmittal affidavit by an associate at Appellees' local Delaware firm attaching various secondary sources. Even as to these sources, the expertise

---

[89] Ct. Ch. R. 44.1.

[90] *Rep. of Pan.*, 2006 WL 1933740, at *5 (citing *Kostolany*, 1995 WL 662683, at *1 (noting that issues of foreign law were fully developed by expert witnesses)).

[91] *Opinion*, 2019 WL 2236844, at *6 n.73.

of the authors was not established. New arguments and one expert affidavit surfaced after the ruling, and the court refused to consider the expert's affidavit. Our review of the record compels us to conclude that Defendants' insufficient initial submission led to the parties' failure to properly join the issues in an orderly way.[92]

The trial judge obviously struggled with the issues and questioned the sufficiency of the record before him prior to ruling. We believe that early input from experts would have been helpful in identifying and explaining the issues based upon the facts and nuances in the case. The failure to identify, early on, and properly join the issues, coupled with the lack of any expert input on the numerous nuances of Austrian and European law that were ultimately raised, leads us to conclude that the Court of Chancery erred in determining that Appellees had satisfied their burden of proof.[93]

We are not today establishing a *per se* rule that expert testimony must be utilized in all instances to establish the substance of foreign law. Admittedly, the issues presented in *Saudi Basic* were unusually complicated given the foreign law at issue and the general lack of familiarity and experience of Delaware courts in applying Saudi Arabian law. But even so, there are instances, such as in *Ashall Homes Ltd. v. ROK Entm't Grp., Inc.*,[94] where the Court of Chancery, when faced with questions of English law (where we do share a common

---

[92] *See Rep. of Pan.*, 2006 WL 1933740, at *5 (holding that the movant articulating the substance of foreign law "should have submitted affidavits from legal experts" in order to satisfy "their threshold requirement of establishing the substance of [foreign law]").

[93] Both sides agreed that our standard of review of foreign law issues is *de novo*. Arguably, the question of determining whether a movant has met its burden of proof involves some exercise of discretion. Even if our review is mixed, and includes some discretionary elements, it does not alter our holdings.

[94] 992 A.2d 1239, 1246 (Del Ch. 2010).

law heritage), found that the parties failed to adequately establish its substance. There, the court concluded that the parties provided in their agreements that their relationship would be governed by English law.[95] But because the court concluded that "neither party has cited to English law—the law for which they bargained—in its briefing on this motion to any material degree,"[96] the court ruled that the analysis "will proceed exclusively under Delaware law."[97] At a minimum, the cases suggest that the movant's initial submission should be fulsome enough to address the foreign law in the context of the specific circumstances at issue, and that the parties and the court should carefully evaluate the need for expert input, particularly if the parties disagree as to the substance of the foreign law. Based upon the foregoing, the court below erred in determining that the Appellees satisfied their burden of proof.

### 3. What is the Effect of Appellees' Failure of Proof?

We next address the resulting effect of Appellees' failure to meet the burden of establishing the substance of foreign law. Appellants contend that the court should decline to apply foreign law, and apply Delaware law instead. Alternatively, this Court could remand to allow the Court of Chancery to consider further evidence on the foreign law issues. However, we do not believe the latter approach is efficient or equitable. Appellees never

---

[95] *Id.* at 1245; *see Rep. of Pan.*, 2006 WL 1933740, at *5. There, the Superior Court concluded that "the Foreign Governments have not satisfied their threshold requirement of establishing the substance of the foreign law," and, therefore, the court did not reach the issue of, assuming that the substance of Panamanian and Brazilian law was properly established, whether the foreign law would apply. Instead, it held that, "Delaware law will control all claims made by the Foreign Governments." *Id.*

[96] *Ashall Homes*, 992 A.2d at 1246.

[97] *Id.*

disputed that they had the burden of proof, and they had an opportunity to put on their proof relating to the operation of Austrian law to these facts.

We utilize, instead, the approach adopted by the Court of Chancery in its decision in *Ashall Homes*, and following this broadly accepted approach,[98] we apply Delaware law to analyze the Forum Clause. As the Court of Chancery correctly observed, "under Delaware law, if the forum selection provision does not state that it is exclusive in crystalline terms, our courts will construe the provision as permissive."[99] Thus, under Delaware law, the Forum Clause is merely permissive, not mandatory.[100] Accordingly, we hold that the Forum Clause presents no bar to the litigation proceeding in Delaware.[101]

---

[98] *See, e.g., In re Avantel, S.A.*, 343 F.3d 311, 322 (5th Cir. 2003) (affirming lower court's application of the "well-settled principle" that when the parties fail to conclusively establish foreign law, a court is entitled to look to its own forum's law).

[99] *Opinion*, 2019 WL 2236844, at *8.

[100] *See In re Bay Hills Emerging P'rs I, L.P.*, 2018 WL 3217650, at *5 (Del. Ch. July 2, 2018) (noting that under Delaware law, a forum clause will be deemed mandatory only if it "contain[s] clear language indicating that litigation will proceed exclusively in the designated forum" (citation omitted)); *RWI Acq. LLC v. Todd*, 2012 WL 1955279, at *6 (Del. Ch. May 30, 2012); *Troy Corp. v. Schoon*, 2007 WL 949441, at *2 (Del. Ch. Mar. 26, 2007) ("If the contractual language is not crystalline, a court will not interpret a forum selection clause to indicate the parties intended to make jurisdiction exclusive." (citation and internal quotation marks omitted)); *Prestancia Mgmt. Grp., Inc. v. Va. Heritage Found., II LLC*, 2005 WL 1364616, at *7 (Del. Ch. May 27, 2005) ("'[A]bsent clear language, a court will not interpret a forum selection clause to indicate the parties intended to make the jurisdiction exclusive.'" (quoting *Eisenbud v. Omnitech*, 1996 WL 162245, at *1 (Del. Ch. Mar. 21, 1996)).

[101] Our review of the record convinces us that the substance of the foreign law at issue has not been established adequately. Because the record is insufficient for us to determine whether the court erred in interpreting Austrian law, we do not address Appellants' specific issues in that regard. *See, e.g., Rep. of Pan.*, 2006 WL 1933740, at *4 ("The Court need not reach the substantive issues regarding the possible application of foreign law because the Foreign Governments have failed to meet their threshold procedural burden in establishing the substantive applicable law of Panama and Brazil.").

B.     *The Remaining Issues on Appeal*

To be as helpful to the Court of Chancery regarding further proceedings on remand, we address the remaining issues on appeal.

1. *The Court of Chancery Correctly Held That Section 168 Is Not the Proper Mechanism to Address the Competing Ownership Claims*

Count I of Appellants' Complaint seeks issuance of new stock certificates pursuant to 8 *Del. C.* § 168.  Appellants allege that they "are entitled to an order requiring Allomet to issue new uncertified shares or a new certificate of stock in the name of AHMR in place of the certificates effectively lost, stolen or destroyed."[102]  They argue that the Court of Chancery can, and has, heard Section 168 cases where there was a question of ownership with respect to the shares and where the location of the certificates is known, but where they are inaccessible.

The Court of Chancery rejected, on two grounds, Appellants' Section 168 argument that denying them a Delaware forum would violate positive law or Delaware's public policy. First, it held that Section 168(a) "does not fit here."[103]  It reasoned that Section 168, which provides for the replacement of a lost, stolen, or destroyed stock certificate for the beneficial owner of the stock, "is not and never was intended to address disputes regarding stock ownership, the resolution of which would require the issuance of new stock, not replacement stock,"[104] and that, here, "[n]o stock has been lost, stolen or destroyed."[105]  Second, the court

---

[102] App. to Opening Br. at A40 (Compl. ¶ 85).

[103] *Opinion*, 2019 WL 2236844, at *9.

[104] *Id.*

[105] *Id.*

36

ruled that, "the aspect of the parties' dispute where Plaintiffs seek to invoke Section 168(a) involves a disagreement regarding the ownership and transfer of shares under an agreement (*i.e.*, the dispute among AHMR and Fobio under either the R&L Agreement or the SPA contemplated by the R&L Agreement)."[106] The court found that, "[t]hat is a dispute grounded in contract, not the DGCL."[107]

On appeal, Appellants contend that the Court of Chancery erred in ruling that Section 168 was the wrong mechanism for them to vindicate their equitable rights to Allomet as owners of AHMR. They point primarily to the holding in *Castro v. ITT Corp.*,[108] where Chancellor Allen allowed an action to proceed under Section 168. Appellants also rely upon Chancellor Allen's statement in a footnote, which they contend allows for the exercise of subject matter jurisdiction based upon equitable principles, even where Section 168 does not "fit" precisely.[109] Appellants argue that the court "should decide a dispute as a matter of equity under Section 168 or otherwise when a Delaware corporation's board chairman and

---

[106] *Id.*

[107] *Id.*

[108] 598 A.2d 674 (Del. Ch. 1991).

[109] There Chancellor Allen noted:

> In all events, petitioners seek mandatory injunctive relief, and in no event may their action be characterized as simply a dispute about *legal* title. The essence of petitioners' claim is that they do not have legal title but can establish equitable title that in the circumstances is sufficient to qualify them as "owners" or "lawful owners" under Section 168. This classically is a matter for a court of equity.

*Id.* at 677 n.4.

chief executive officer sells stock and delivers stock certificates to the purchaser but then interferes with the purchasers' ability to exchange those certificates."[110]

Appellees, on the other hand, contend that a claim arising under Section 168 requires that two predicate facts be alleged: (1) the stock in dispute was owned and issued to the plaintiff previously; and (2) the stock certificate representing the shares owned were "lost, destroyed or stolen." They claim neither is satisfied.

We agree with the Court of Chancery that the question of ownership is, and has been, disputed all along. Among other issues, the parties disagree as to the legal effect of the Supplementary Agreement. Appellants allege that, "[t]he purpose of the Supplementary Agreement was to acknowledge that the AHMR shareholders were considering with their advisors the tax implications of the transfer of Allomet's and Yanchep's equity to AHMR."[111] Yet they maintain that the Supplementary Agreement was clear that any amendments to the transaction agreements would occur by March 31, 2018, at which time the Supplementary Agreement would expire, and the parties were to "'regard the already

---

[110] Opening Br. at 20. Appellants also criticize the Vice Chancellor for not addressing *Castro* in his written decision. But we note that *Castro* was discussed by the parties and commented on by the court during oral argument. For example, the Vice Chancellor observed during oral argument on the motion to dismiss:

> [T]he *Castro* case was a case where there were undisputed members of an entity that was being held hostage by the Cuban government. And the Court, invoking equity, said it's dissolved. There was no dispute then what was going to happen as a result of the dissolution. The members' ownership in the entity, not disputed. Right? Here, what your friends on the other side are saying is "No, no. They are not 50 percent owners here. They have no equity interest in this. They didn't get there."

App. to Opening Br. at A730–A731.

[111] App. to Opening Br. at A33 (Compl. ¶ 61).

signed [Transaction Agreements] as definitive' and should 'then be Executed/Implemented as such.'"[112] Appellants allege that in breach of the R&L Agreement and SPA, Allomet has not reissued its stock in AHMR's name. Instead, "the stock certificates previously owned by Fobio remain in Fobio's name and "[t]he stock certificates previously owned by Toth remain in Toth's name."[113] Accordingly, they allege that, "Allomet's stock certificates, have been *effectively* lost, stolen, or destroyed because they are locked in a safe-deposit box in Vienna that cannot be accessed without Dr. Hereth."[114]

Appellees, on the other hand, point to other language in the Supplementary Agreement that refers to agreements referenced therein as having not yet "been legally signed."[115] Paragraph 4 of the Supplementary Agreement refers to certain "further payments" which "shall be made within one month following full legal implementation or after all the contracts mentioned in this Agreement have become legally binding and been executed as well as after all the Allomet shares have been transferred to Vienna and once this 'Supplementary Agreement' has fully expired."[116] Moreover, they maintain that the Supplementary Agreement contemplated another "Supplementary Agreement" that was never drafted or executed. Thus, the parties clearly disagree as to their ownership interests in AHMR.

---

[112] *Id.* (Compl. ¶ 62) (quoting Supplementary Agreement).

[113] *Id.* at A39 (Compl. ¶ 83).

[114] *Id.* (Compl. ¶ 84) (emphasis added).

[115] *Id.* at A92 (Ex. G ¶ 4).

[116] *Id.*

We believe *Castro* is distinguishable, principally because in *Castro*, there was no question as to the petitioners' ownership interests in the partnership prior to the seizure of the partnership by the Cuban government. Moreover, the decision in *Castro* focused heavily on the legal effect of the Cuban government's seizure of the partnership and the application of the principle that "U.S. domestic law ought not to facilitate indirectly the seizure by a foreign government without just compensation of property located in the U.S. . . ."[117] In view of the parties' heavy focus on *Castro*, we address it here.

The petitioners in *Castro*, general partners and heirs of partners in a Cuban partnership, claimed to be the equitable owners of the original shares of stock in ITT Corporation (a Delaware corporation) which were registered in the name of the partnership. In 1962, the Cuban government forcibly seized the partnership, allegedly, without paying any compensation. The following year, the U.S. government froze all assets of Cuban nationals or entities located in the United States. Thereafter, in 1968, ITT declared a two-for-one stock dividend. Because of the government's blocking order, ITT never delivered the stock dividend or later cash dividends on the original shares to the partnership. In 1989 and 1990, the U.S. Treasury issued unblocking licenses authorizing ITT to unblock the disputed shares and all accumulated dividends.

Cross motions for summary judgment were filed when petitioners sought to compel ITT, pursuant to Section 168, to issue stock certificates and pay cash dividends and to transfer the shares and accumulated dividends that were being accumulated and held by ITT for the

---

[117] *Castro*, 598 A.2d at 680.

owner of the shares. ITT declined to transfer the shares as authorized by the Treasury licenses and insisted that petitioners furnish it with a surety bond that would fully protect it in the event a later owner appeared. At the time the petition was filed, it was alleged that, over the years, no claims or communications had been made to ITT with respect to these shares by anyone other than petitioners.[118] Petitioners argued that if their claim to beneficial ownership were provable, failure to recognize it would accord an illicit seizure the dignity of a valid act of state—something courts in similar cases have refused to do.

ITT asserted that because the petitioners were not registered owners of its stock, it did not have an obligation to recognize their equitable ownership claims. It also argued that the court did not have jurisdiction over this matter because it was essentially one to determine legal title to property. Lastly, it argued that the case must be dismissed because the Republic of Cuba was an indispensable party.

Chancellor Allen rejected all three assertions and denied both motions for summary judgment. He first considered the question of whether the petitioners were precluded from relief because the shares were registered to the partnership entity rather than the petitioners. Examining the language in 8 *Del. C.* § 168, he concluded that, "[t]he language of that section makes it apparent that the 'owners' that have rights under that section are not limited to 'registered owners.'"[119] He reasoned that, "[t]here are commonly occurring situations in which, by reason of death, dissolution, or merger of the registered owner or transfer by it, a

---

[118] The court noted, however, that since that time, an individual had come forward with possession of certificates for 400 shares registered in the name of the partnership and claimed to have information regarding other certificates. *Id.* at 676 n.3.

[119] *Id.* at 677.

person other than the registered owner will, upon appropriate proof, be recognized as the owner of lost certificates under Section 168."[120] "Thus, for purposes of Section 168, registration on the issuer's stock ledger as the owner is not critical; the substance of petitioners' claim to be the 'lawful owner' of lost, stolen or destroyed certificates is."[121]

The court then addressed ITT's assertions regarding whether petitioners were "lawful owners" and their claim that the resolution of that question was governed by Cuban law since the partnership was a Cuban entity. In this regard, ITT argued that "the Partnership continues to exist and its present owner—presumably the Republic of Cuba pursuant to its sovereign act of seizure—and not petitioners have rights to the property at issue."[122] Thus, ITT claimed that under Cuban law, the petitioners were not the "lawful owners." The court noted the existence of a number of factual and legal questions, including whether any compensation had been paid. If compensation had not been paid, then "our federal Constitution would appear to dictate that the act of seizure be accorded no effect by courts of this country."[123]

The court then observed that, "[t]o support the assertion that under our law the Cuban government's seizure of the Partnership *could not affect the equitable ownership of the original shares*, two propositions must be established,"[124] namely, (1) that the acts of a foreign government are not immune from judicial review to the extent that those acts purport

---

[120] *Id.* at 678.

[121] *Id.*

[122] *Id.*

[123] *Id.* If an exchange existed, then the Act of State Doctrine may require the court to regard the seizure as valid for purposes of determining who owned the property. However, if there was not an exchange, then the federal Constitution would hold the seizure as ineffective in the United States.

[124] *Id*. (emphasis added).

to affect property outside of the foreign sovereign; and (2) that the courts in the United States will not respect the act of confiscation without compensation of a foreign government. The court's discussion then focused on the effect of the Cuban government's seizure of the partnership.

The court found that the first proposition was well established—that the courts in the United States will not give "extraterritorial effect" to a confiscatory decree of a foreign government even when it is directed at its own nationals. As to the second proposition—that courts in this country will not respect the act of a foreign government that amounts to a confiscation—the Court was guided by *Zwack v. Kraus Bros. & Co.*,[125] a decision of the Second Circuit Court of Appeals. As Chancellor Allen concluded, the *Zwack* court reflected the tendency of courts "to put technicalities to the side when dealing with the domestic consequences of foreign seizures without just compensation."[126] He then found that the principle that United States domestic law ought not to facilitate indirectly the seizure by a foreign government without compensation of property within the United States applied to the

---

[125] 237 F.2d 255 (2d Cir. 1956).

[126] *Castro*, 598 A.2d at 680. In *Zwack*, the Hungarian government seized a Hungarian company and the petitioners were the partners of the company prior to seizure. The respondent was a New York corporation that held a license for the company and owed it royalties accumulated pursuant to a freeze order during years of war. The petitioners sued to collect the royalties, for an accounting, and for cancellation of the license. Among its defenses, the company claimed that the petitioners had no standing under Hungarian law. The court disagreed and found that where assets within the state are concerned, technical consideration as to the manner in which the foreign state seeks to appropriate them are not controlling. It found that prior to the confiscation, the assets in New York and those in Hungary were equitably owned by the petitioners; therefore, the Hungarian government could not directly seize those assets which had a situs in the state of the forum. It held that, "[t]o allow it to do so indirectly through confiscation of firm ownership [would] be to give its decree extraterritorial effect and thereby emasculate the public policy of the forum against confiscation." *Zwack*, 237 F.2d at 258.

facts alleged in *Castro*. Accordingly, the Court of Chancery concluded that petitioners in *Castro* did have standing to bring the action under Section 168. Thus, he held that, "putting aside for the moment questions of bond, of notice to others, and the validity of other claims—that if petitioners prove the allegations they make, they will be entitled to relief under Section 168."[127]

Further, the court commented that it had jurisdiction over the matter even if Section 168 did not apply. It recognized that the petitioners sought mandatory injunctive relief and that their action was not simply a dispute about *legal* title. Rather, the essence of petitioners' claim was that they could "establish equitable title that in the circumstances is sufficient to qualify them as 'owners' or 'lawful owners' under Section 168," and that, "[t]his classically is a matter for a court of equity."[128]

We conclude that in order to pursue a claim under Section 168, a claimant should be able to assert that she was the registered or beneficial owner of the shares before the shares were lost, stolen or destroyed. Differently stated, for Section 168 purposes, one cannot lose a share, or have it be stolen or destroyed, if she did not somehow own the share to begin with. When ownership is the issue at hand, as it is here, other mechanisms provide the claimant a remedy. *Castro* is not inconsistent with that proposition. The petitioners there were not seeking to litigate a dispute about whether they were partners in the entity that

---

[127] *Castro*, 598 A.2d at 680. The Chancellor rejected ITT's assertion that the Republic of Cuba was an indispensable party but ordered that a mechanism, including publication of notice in Havana and Miami, be devised so that third persons claiming any rights to the original shares might be given notice and an opportunity to be heard.

[128] *Id.* at 677 n.4.

44

owned the ITT shares. That was undisputed. Rather, Chancellor Allen saw that there was a question of whether the partnership should be deemed dissolved as a result of the seizure and that, by operation of law, the petitioners were the owners of the partnership's assets (*e.g.*, the ITT stock).

Moreover, it is evident that the Court of Chancery in *Castro* was also taking into account the broader public policy concerns regarding the seizure by a foreign government of U.S. assets without compensation. Appellants here, by contrast, are seeking to establish, through this litigation, their initial ownership interests in AHMR under a series of agreements—the legal effect of which is hotly disputed. Then, purporting to act on behalf of AHMR, they seek an order declaring AHMR to be the rightful owner of all outstanding shares of Allomet stock and to have Allomet cancel all outstanding stock and reissue stock in the name of AHMR. The stock is clearly not lost, stolen or destroyed. Rather, it is in a vault in Austria pending resolution of the underlying ownership issues arising from this failed joint venture and the various web of agreements. Accordingly, we affirm the Court of Chancery's dismissal of Appellants' Section 168 claim.

2. *The Section 115 Issue is Moot*

Appellants contend that the Court of Chancery overlooked the public policy embedded in Section 115. The Court of Chancery held that "Section 115 places limitations on the scope of forum selection provisions that Delaware corporations may place in their governing documents; it does not reach other contracts between the corporation's

constituents."[129] Further, it held that, "[s]tockholders can expressly waive Delaware venue in a contract between stockholders and the corporation," and that is "precisely what the parties did."[130] Appellants assert that if the Court of Chancery's holding on Section 115 is allowed to stand, the intent of the General Assembly would be frustrated. That is because, according to Appellants, Delaware corporations could simply eliminate Delaware as a choice of forum with mandatory forum selection clauses to allow courts in states outside of Delaware to resolve disputes over stock issuance, fiduciary duty claims against Delaware officers and directors, and other statutorily defined "internal corporate claims."

We hold that Appellants' arguments pertaining to the potential impact of 8 *Del. C.* § 115 are now moot. If the Forum Clause were mandatory, we would need to resolve Appellants' contention that the provision in this instance would undermine the policy underlying Section 115. But because we rule that the Forum Clause is permissive, we need not address these arguments and decline to render an opinion that would be purely advisory.[131]

## IV. CONCLUSION

For the foregoing reasons, we **AFFIRM** in part, **REVERSE** in part, and **REMAND** this matter to the Court of Chancery for further proceedings consistent with this opinion.

---

[129] *Opinion*, 2019 WL 2236844, at *10.

[130] *Id.*

[131] *See Stroud v. Milliken Enters., Inc.*, 552 A.2d 476, 480 (Del. 1989) ("The law is well settled that our courts will not lend themselves 'to decide cases which have become moot, or to render advisory opinions.'" (citation omitted)).